# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JANE DOE, *by and through her parents and next friends*, JOHN DOE and JILL DOE,<br><br>Plaintiff,<br><br>v.<br><br>ELKHORN AREA SCHOOL DISTRICT, JASON TADLOCK, and RYAN MCBURNEY,<br><br>Defendants. | Case No. 24-CV-354-JPS<br><br><br><br>**ORDER** |

In March 2024, Plaintiff Jane Doe, by and through her parents and next friends, John Doe and Jill Doe ("Plaintiff"), sued Defendants Elkhorn Area School District (the "EASD"), EASD Superintendent Jason Tadlock ("Tadlock"), and Elkhorn Area Middle School ("EAMS") Principal Ryan McBurney ("McBurney") (together, "Defendants") alleging violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX") and the Equal Protection Clause of the Fourteenth Amendment. ECF No. 1. In April 2024, Plaintiff moved for a preliminary injunction

> restraining EASD and its officers, administrators, employees, and agents, from enforcing any policy, practice, protocol, or custom of EASD or [EAMS] that denies Plaintiff the ability to access and use girls' restrooms at EAMS or any other EASD school that she may attend in the future, or otherwise denying or restricting her access to girls' or women's restrooms at school or on school trips.

ECF No. 15 at 1. At bottom, the relief that Plaintiff seeks is "simple . . . : to use the [girls'] restroom while at school." ECF No. 16 at 5 (quoting *Whitaker*

by *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1039 (7th Cir. 2017), *abrogated on other grounds by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) and citing *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 764 (7th Cir. 2023), *cert. denied sub nom. Metro. Sch. Dist. of Martinsville v. A. C.*, 144 S. Ct. 683 (2024)).

Defendants oppose the motion, which is now fully briefed. ECF Nos. 16, 31, 38. The same day that Defendants filed their opposition, the Empowered Community Coalition, U.A. (the "Coalition"), "an unincorporated association of parents with minor children in the [EASD]," moved for leave to file an amicus brief. ECF No. 33.[1] Plaintiff does not appear to oppose that motion. ECF No. 38 at 16; ECF No. 45. For the reasons explained below, both Plaintiff's motion for preliminary injunction and the Coalition's motion for leave to file an amicus brief will be granted.[2]

---

[1]The Coalition also simultaneously filed a conditional motion to intervene under Federal Rule of Civil Procedure 24(a)(2) and asked the Court to hold the motion in abeyance until it becomes clear "whether [Defendants] will adequately represent [the Coalition's] interests." ECF No. 33 at 3 (arguing that "[i]f the Coalition waits to intervene until representation becomes inadequate, it risks a finding by this [C]ourt that a motion to intervene is untimely"). The Court denied the motion without prejudice and granted the Coalition leave to refile it at such time that the Coalition wishes the Court to act on it "without concern as to timeliness." June 21, 2024 Text Only Order; *see also* ECF No. 45 (Plaintiff's unopposed motion to stay her response deadline to the motion to intervene until such time that the Coalition alleges that representation has become inadequate).

[2]In the course of briefing, Plaintiff filed two unopposed motions to seal declarations and/or documents attached to declarations in support of the motion for preliminary injunction. ECF Nos. 13, 40, 44. The Coalition also moved to restrict declarations attached to the motion for leave to file an amicus brief. ECF No. 34. The Court will grant these motions; all affected declarations and/or attachments shall remain sealed (as to Plaintiff's motions) and restricted (as to the Coalition's motion) pending further order of the Court. The Court commends the parties for their careful reading of the Court's pretrial order, ECF No. 5, and their adherence to the Court's preferences.

## 1.    THRESHOLD LEGAL ISSUES

Preliminarily, the Court takes up three threshold legal issues that govern the scope of the evidentiary material the Court will draw from in summarizing the factual record underlying Plaintiff's motion for a preliminary injunction.

### 1.1    Consideration of Declaration of John Doe

Defendants argue that the Court should disregard facts drawn from the declaration of John Doe, ECF No. 15-1, because the declaration lacks "any factual support from [Plaintiff]," and because "John Doe cannot testify as to what Plaintiff . . . is feeling or Plaintiff's emotional state." ECF No. 31 at 24 (citing *Polycon Indus., Inc. v. R&B Plastics Mach., LLC*, No. 2:19-CV-485-PPS-JPK, 2022 WL 426582, at *2 (N.D. Ind. Feb. 10, 2022) ("Declarations must be made with personal knowledge and should include facts admissible in evidence and state that the declarant is competent to testify regarding the matters in the declaration.")). In particular, Defendants take issue with John Doe's statements as to Plaintiff's gender dysphoria as well as Plaintiff's feelings of isolation, fear, distress, and embarrassment. *Id.* at 25 (citing ECF No. 15-1 at 2, 4–5, 6, 9–10, 11).

Defendants' argument is unavailing. First, "evidentiary rules are relaxed at the preliminary injunction stage, and the Court has substantial discretion to hear and receive evidence intended to 'preserve the relative positions of the parties until a trial on the merits can be held,' whether or not that evidence complies with formal rules and procedures." *City of Evanston v. N. Ill. Gas Co.*, 381 F. Supp. 3d 941, 948–49 (N.D. Ill. 2019) (citing *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) and *Dexia Crédit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010)).

Case 2:24-cv-00354-JPS    Filed 08/01/24    Page 3 of 47    Document 49

Second, and this rule notwithstanding, John Doe's declaration complies with the formal evidentiary rules and procedures. John Doe avers under penalty of perjury that he is competent to make his declaration and has personal knowledge of the matters stated therein. ECF No. 15-1 at 1, 13. His personal observations of his daughter, including his review of her medical and educational records, are admissible in evidence. *See Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 565 (7th Cir. 2006) (a layperson's description of the plaintiff's medical condition as "depressed" is admissible under Federal Rule of Evidence 701 as "rationally based on the perception of the witness . . . and not based on scientific, technical, or other specialized knowledge") (quoting Fed. R. Evid. 701); *see also McGlenn v. Madison Metro. Sch. Dist.*, No. 21-CV-683-JDP, 2024 WL 359107, at *4 (W.D. Wis. Jan. 31, 2024) ("Others who observed the plaintiff's behavior may have testimony relevant to the extent of plaintiffs' sadness, anxiety, or other negative emotions. Particularly [where] all the plaintiffs were minors during the events that gave rise to this case, a parent or guardian may be in a better position than even the plaintiff herself to describe the effect that defendants' conduct had on her.").

This is particularly true where, as here, "the attached exhibits provide sufficient further foundation for [the declarant's] testimony." *Polycon*, 2022 WL 426582, at *2. Plaintiff has attached exhibits corroborating her clinical diagnoses, ECF Nos. 15-25, 15-26, and she has provided her own declaration averring both that "all of the facts about [her] experiences at school contained in [John Doe's] declaration are correct" and that, if called, she will testify at trial as to these facts and the effects on her, ECF No. 42. Therefore, for all these reasons, the Court can and will draw from John

Doe's declaration in summarizing the facts underlying the motion for a preliminary injunction.

### 1.2 Consideration of Declaration of Dr. Stephanie L. Budge

With her reply brief, Plaintiff submits the declaration of her expert witness, Dr. Stephanie L. Budge ("Dr. Budge"). ECF No. 43. Defendants did not move to file a sur-reply as to the opinions proffered by Dr. Budge, nor did they move to strike her declaration. Because they did not do so, and ostensibly therefore perceive no prejudice from the Court's consideration of the declaration, the Court will consider the declaration. *Cf. Aon PLC v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 WL 4192072, at *31 (N.D. Ill. Sept. 15, 2021) (declining to strike new declaration submitted with preliminary injunction reply papers in part because the defendants requested, and were given leave, to file a sur-reply; therefore, they were not prejudiced).

Nor do Defendants challenge Dr. Budge's role as an expert witness. Even if they had, again, "evidentiary rules are relaxed at the preliminary injunction stage." *City of Evanston*, 382 F. Supp. 3d at 948 (citations omitted). At this juncture, the Court is satisfied that it can receive and consider Dr. Budge's expert declaration. *See Davis v. Duran*, 277 F.R.D. 362, 365 (N.D. Ill. 2011) ("[C]ourts are not allowed to 'take . . . on faith' whatever a paid expert claims," and they "have an independent obligation . . . to [e]nsure that proffered scientific evidence rests on a reliable foundation.") (quoting *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) and citing *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993)).

> In considering whether to admit expert testimony, district courts employ a three-part framework that inquires whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology

> underlying the expert's testimony is reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue.

*City of Evanston*, 382 F. Supp. 3d at 948 (citing *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893–94 (7th Cir. 2011)).[3]

Dr. Budge has a master's degree in educational psychology and a Ph.D. in counseling psychology, with a concentration on transgender individuals' mental health. ECF No. 43 at 2. She has been a mental health provider to transgender individuals since 2007, and transgender individuals have comprised the majority of her caseload since 2011. *Id.* A significant portion of her clinical work has focused on transgender adolescents. *Id.* at 2–3. Dr. Budge has published 109 peer-reviewed articles and book chapters, with the majority focusing on transgender individuals. *Id.* at 3. To prepare her declaration, she reviewed several filings in this case, as well as Plaintiff's Gender Support Plans, academic records, and mental health records. *Id.* at 5. She also completed a clinical evaluation of Plaintiff. *Id.* at 27. Dr. Budge's opinions are based on her education, clinical experience, research findings, and her review of seminal psychological and

---

[3]Congress approved an amendment to the text of Rule 702, which took effect on December 1, 2023. Fed. R. Evid. 702.

The amendment "clarif[ies] and emphasize[s] that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Advisory Committee's Note to April 24, 2023 Proposed Amendment to Rule 702 at 210, *available at* https://www.uscourts.gov/sites/default/files/2023_congressional_package_april_24_2023_0.pdf (last visited Aug. 1, 2024). Although the rule, in both its original and amended forms, does not "require[] the court to nitpick an expert's opinion in order to reach a perfect expression of what the [expert's] basis and methodology can support," it also "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." *Id.* at 213.

public health research on transgender individuals. *Id.* at 5–6. Dr. Budge applies the World Professional Association for Transgender Health ("WPATH") standards of care in formulating her opinions. *Id.* at 9–12. Her opinions as to Plaintiff's clinical diagnosis of gender dysphoria and the psychological effects of Plaintiff not being permitted to use restrooms that correspond to her gender identity are highly relevant to this case and particularly to the motion for a preliminary injunction.

As such, the Court finds Dr. Budge qualified, her methodology reliable, and her opinions both reliably supported by her methodology and highly relevant to this case. *See, e.g., Owens v. Nat'l Collegiate Athletic Ass'n*, No. 11 C 6356, 2022 WL 2967479, at *6 (N.D. Ill. July 27, 2022) ("Dr. Cantu's application of his expertise in his examination of Plaintiffs and their medical histories to arrive at a scientific medical opinion is precisely the type of methodology that a physician should employ.") (citing *Hall v. Flannery*, 840 F.3d 922, 928 (7th Cir. 2016)); *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 543 (S.D. Ill. 2019) (concluding that the WPATH standards of care are a reliable methodology and that individuals who "have treated thousands of individuals with gender issues, authored roughly sixty peer-reviewed articles on transgender health, and earned a medical degree and Ph.Ds" are qualified to testify on transgender health).

The Court will therefore consider Dr. Budge's opinions specific to Plaintiff and the preliminary injunction standard as it summarizes the record underlying the motion for a preliminary injunction. *Cf. A.M. by E.M. v. Indianapolis Pub. Schs.*, 617 F. Supp. 3d 950, 958 (S.D. Ind. 2022), *preliminary injunction vacated by stipulation*, No. 1:22-CV-01075-JMS-MKK, 2023 WL 11852464 (S.D. Ind. Jan. 19, 2023) (declining to consider expert testimony that did not bear on preliminary injunction inquiry).

### 1.3 The Coalition's Motion for Leave to File an Amicus Brief

The Coalition moves for leave to file an amicus brief "to show the harms to all the other students if this Court requires the [EASD] to allow students asserting a transgender identity to use whatever bathroom they associate with." ECF No. 33 at 9. The Coalition attaches its proposed amicus brief to the motion, ECF No. 33-1, along with six declarations from its members, ECF No. 33-2–33-7.

The Court will grant the Coalition's motion. "Unlike the courts of appeal, there is no rule of procedure that governs motions for leave to file a brief as an amicus curiae in district court." *Johnson v. U.S. Off. of Pers. Mgmt.*, No. 14-C-0009, 2014 WL 1681691, at *1 (E.D. Wis. Apr. 28, 2014). "However, the Seventh Circuit has explained that allowing an amicus curiae brief is a matter of 'judicial grace.'" *Id.* (quoting *Voices for Choices v. Ill. Bell Tel. Co.*, 339 F.3d 542, 544 (7th Cir. 2003)). Courts should "'not grant rote permission to file such a brief,'" particularly when the proposed brief "'essentially duplicates a party's brief.'" *Id.* (quoting *Voices for Choices*, 339 F.3d at 544). The critical inquiry is "whether the brief will assist the judge[ ] by presenting ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs." *Id.* (quoting *Voices for Choices*, 339 F.3d at 545). The Coalition's amicus brief provides legal argument absent from the parties' briefs, and its members' declarations provide perspectives and facts absent from the parties' briefs. Accordingly, the Court will consider both the amicus brief and the declarations as it summarizes the facts underlying the motion for a preliminary injunction.

## 2.    FACTS[4]

### 2.1    Plaintiff's Background

Plaintiff is a 13-year-old girl who lives in Elkhorn, Wisconsin with her parents, John Doe and Jill Doe. ECF No. 16 at 7 (citing ECF No. 15-1 at 1). Plaintiff attends EAMS, a public middle school within the EASD. *Id.* (citing ECF No. 15-1 at 2). Plaintiff just completed the seventh grade at EAMS during the 2023–2024 school year, will attend EAMS for the eighth grade during the 2024–2025 school year, and her parents anticipate that she will then attend Elkhorn Area High School ("EAHS"). *Id.* (citing ECF No. 15-1 at 1). Plaintiff is transgender. *Id.* (citing ECF No. 15-1 at 1). Plaintiff has experienced gender dysphoria—the clinically significant distress resulting from a marked incongruence between one's assigned sex and one's gender identity—since the third grade. *Id.* (citing ECF No. 15-1 at 2 and ECF No. 15-34). She was formally diagnosed with Gender Dysphoria in Adolescents and Adults ("Gender Dysphoria") by her treating therapist in February

---

[4]Having addressed the parties' dispute regarding whether the Court may consider John Doe's declaration, as well as the other threshold legal issues set forth *supra* Section 1, the Court observes that the parties generally agree on the facts. ECF No. 16 at 7–17; ECF No. 31 at 2–6. Because "[t]he parties' briefs suggest that most of the basic historical facts are not disputed" and because the Court's "resolution of [Plaintiff's] motion for a preliminary injunction does not turn on any specific contested fact," the Court compiles the following factual summary from both parties' proposed findings of fact, as set forth in their briefs, and the evidentiary support therefor. *Minocqua Brewing Co. LLC v. Town of Minocqua*, No. 24-CV-135-JDP, 2024 WL 1619351, at *1 (W.D. Wis. Apr. 15, 2024). "As a result, the events discussed in this section should be viewed as background information, not as findings of fact." *Id.*

Because there are no genuine issues of material fact, the Court enters this Order without holding an evidentiary hearing. *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 814 (7th Cir. 2002) (citing *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997)).

2024, from whom she is receiving weekly treatment. *Id.* (citing ECF No. 15-1 at 2, ECF No. 15-25, and ECF No. 15-26).

Plaintiff began to slowly transition to her female gender identity in 2020 and began to live consistently as a girl in the fall of 2022 after she started sixth grade at EAMS. *Id.* (citing ECF No. 15-1 at 2). At that time, she began carrying a purse, growing out her hair, wearing traditionally feminine clothing, using pronouns typically used by girls and women, adopting a more feminine name instead of her traditionally male given name, and occasionally using girls' restrooms at EAMS. *Id.* at 7–8 (citing ECF No. 15-1 at 2). Since that time, she has continued to live all aspects of her life as a girl. *Id.* at 8 (citing ECF No. 15-1 at 2).

### 2.2    The EASD's Background

The EASD is a public school district in Elkhorn, Wisconsin, serving seven schools, including EAMS. ECF No. 31 at 2 (citing ECF No. 32 at 2). In October 2016, the EASD adopted policies and procedures governing the treatment of transgender and gender nonconforming students in its schools. ECF No. 16 at 8 (citing EASD, *School Board Meeting*, YouTube, at 5:30 (July 24, 2023) (URL omitted) ("July 24, 2023 Board Meeting"), ECF No. 15-5, and ECF No. 15-8); ECF No. 31 at 2 (citing ECF No. 32 at 2, ECF No. 15-5, and ECF No. 15-8). These policies and procedures are contained in two documents—the "Nondiscrimination Procedures" and the "Gender Support Protocols"—which have been amended several times since their adoption. ECF No. 16 at 8–9 (citing ECF Nos. 15-4, 15-5, and 15-8); ECF No. 31 at 2 (citing ECF No. 32 at 2).

The Nondiscrimination Procedures list "Student Rights at School for Those Who Are Transgender and Gender Non-Conforming." ECF No. 16 at 9 (quoting ECF No. 15-5 at 5). The rights enumerated on this list include

"the right to use restrooms and locker rooms that match your gender identity, and . . . [to not] be forced to use separate facilities." *Id.* (quoting ECF No. 15-5 at 5). A December 2021 training for EASD personnel echoed these concepts. *Id.* (citing ECF No. 15-7 at 11–14). EASD administrators have also attended two trainings on nondiscrimination protections under Title IX. *Id.* at 10 (citing ECF Nos. 15-3 and 15-6). Both trainings addressed the Seventh Circuit's decision in *Whitaker*, 858 F.3d 1034, holding that excluding a transgender student from restrooms matching the student's gender identity violates Title IX and other case law. *Id.* (citing ECF No. 15-3 at 27–31 and ECF No. 15-6 at 16–19).

Under the Gender Support Protocols, any transgender student who wants their gender identity respected at school is required to enter into a written "Gender Support Plan." *Id.* at 9 (citing ECF No. 15-8 at 4). The EASD's template Gender Support Plan addresses various topics, including a student's use of restrooms at school and on school trips. *Id.* (citing ECF No. 15-5 at 8–11). Under EASD policy and practice, a transgender student—unlike cisgender students—is prohibited from using any restrooms not specifically authorized on the Gender Support Plan. *Id.* (citing July 24, 2023 Board Meeting at 18:54).

Until the most recent revision in October 2023, the EASD's Gender Support Protocols provided the following instructions:

District Facility Use:

As we complete the gender support plan, we should *always* ask the student their preference for locker room and bathroom use and not assume they want to use the facilities consistent with their gender preference or sex. We also have to be careful not to put *any* restrictions on the use of the facilities. While the District *cannot require a transgender student to use gender-neutral facilities* when possible the District should

have a gender-neutral location that can be used by anyone. *Please note that refusing to allow a student access to and use of facilities consistent with their gender identity may be a violation of Title IX.*

*Id.* at 10 (quoting ECF No. 15-4 at 6); ECF No. 15-4 at 2.

### 2.3 EAMS's Background

There are four girls' bathrooms and four boys' bathrooms in EAMS: two on the second floor and two on the first floor. ECF No. 31 at 3–4 (citing ECF No. 32 at 3 and ECF No. 32-2). There are six gender-neutral bathrooms: two on the second floor and four on the first floor. *Id.* at 4 (citing ECF No. 32 at 4 and ECF No. 32-2). At no point is a gender-neutral bathroom more than 110 feet from girls' bathrooms. *Id.* (citing ECF No. 32 at 4).

Gender-neutral bathrooms are available to all students at EAMS and there is no special permission needed to use a gender-neutral bathroom. *Id.* (citing ECF No. 32 at 4). Cisgender students and transgender students both utilize the gender-neutral bathrooms; accordingly, when observing students coming and going from the gender-neutral bathrooms, one cannot discern that a student is transgender. *Id.* (citing ECF No. 32 at 4).

### 2.4 Plaintiff's 2022–2023 School Year

In November 2022, during the 2022–2023 school year when Plaintiff was in sixth grade at EAMS, Plaintiff asked a teacher to be listed by her female name. ECF No. 16 at 11 (citing ECF No. 15-1 at 2–3); ECF No. 15-1 at 1, 5. The teacher informed Plaintiff that to use Plaintiff's chosen name, Plaintiff would need to enter into a Gender Support Plan. ECF No. 16 at 11 (citing ECF No. 15-1 at 2–3). Shortly thereafter, Plaintiff's guidance counselor, Todd Ghilani ("Ghilani"), met with Plaintiff. *Id.* (citing ECF No. 15-1 at 3). At the meeting, Plaintiff told Ghilani that she is transgender. *Id.*

(citing ECF No. 15-1 at 3). This was the first instance that the EASD was aware that Plaintiff is transgender. ECF No. 31 at 3 (citing ECF No. 32 at 3).

Ghilani called Plaintiff's parents to inform them that Plaintiff had come out to him as transgender and asked them to come to his office to create a Gender Support Plan. ECF No. 16 at 11 (citing ECF No. 15-1 at 3). Plaintiff's parents met with Ghilani the same day. *Id.* (citing ECF No. 15-1 at 3). Plaintiff's parents did not present anyone within the EASD with any medical documentation to support that Plaintiff had been formally diagnosed with Gender Dysphoria. ECF No. 31 at 3 (citing ECF No. 32 at 3). Until this lawsuit was filed and served, the EASD did not know that Plaintiff had been diagnosed with Gender Dysphoria by a medical provider. *Id.* (citing ECF No. 32 at 2).

At the meeting with Plaintiff's parents, Ghilani walked through the template Gender Support Plan. ECF No. 16 at 11 (citing ECF No. 15-1 at 3–4 and ECF No. 15-9 at 2–5). Most of the sections were completed with Plaintiff's and her parents' input and agreement. *Id.* (citing ECF No. 15-1 at 3–4). However, Ghilani completed the "Facilities" section of the form, which addressed restroom and locker use at school and on school trips, without soliciting Plaintiff's parents' input. *Id.* at 11–12 (citing ECF No. 15-1 at 4–5 and ECF No. 15-9 at 3). Instead, he unilaterally decided that Plaintiff would use faculty restrooms at school both as a bathroom and changing area, and that Plaintiff would use "Female" facilities on class trips. *Id.* at 12 (citing ECF No. 15-1 at 4–5 and ECF No. 15-9 at 3). Although Plaintiff wanted to use girls' facilities at school as well as on class trips, neither she nor her parents were provided that option. *Id.* (citing ECF No. 15-1 at 4–5).

During the 2022–2023 school year, the two faculty restrooms that Plaintiff was allowed to use were both located in the school's main office

and were further away from her classes than the girls' bathrooms. *Id.* (citing ECF No. 15-1 at 5). For her physical education ("PE") class, Plaintiff was required to change her clothes before and after class in one of those faculty restrooms. *Id.* (citing ECF No. 15-1 at 5–6). Because those restrooms were further away from the girls' locker rooms, she was forced to arrive late to and leave early from PE class. *Id.* (citing ECF No. 15-1 at 5–6). This caused Plaintiff to lose significant PE class time. *Id.* (citing ECF No. 15-1 at 5–6).

For the rest of the 2022–2023 school year, Plaintiff experienced significant and escalating anxiety, embarrassment, and social isolation from being forced to use faculty restrooms instead of the girls' restrooms that her female classmates could use. *Id.* (citing ECF No. 15-1 at 5, 6). On one occasion, Plaintiff felt sick and ran to the nearest restroom, which was the restroom in the nurse's office near the main office faculty restrooms. *Id.* (citing ECF No. 15-1 at 6). However, the door was locked, so Plaintiff had to go through the main office to use the faculty restrooms. *Id.* (citing ECF No. 15-1 at 6). She nearly vomited in the hallway because she was almost unable to reach the restroom in time. *Id.* (citing ECF No. 15-1 at 6).

To avoid these harms, Plaintiff used girls' restrooms at school on several occasions in the spring of 2023. *Id.* at 13 (citing ECF No. 15-1 at 6). She was pulled aside or from class, reprimanded, and threatened with discipline by three separate EAMS faculty members for her bathroom use. *Id.* (citing ECF No. 15-1 at 6–7). The distress, embarrassment, and fear of discipline caused Plaintiff to avoid going to school and to accumulate several absences at the end of sixth grade. *Id.* (citing ECF No. 15-1 at 6).

### 2.5 Summer 2023 and Changes to the Gender Support Protocols

In late June 2023, an individual posted on social media that "a biological boy [] (who is allegedly identifying as a girl or non-binary)" had

used girls' restrooms at EAMS the previous school year. *Id.* at 13 (quoting ECF No. 15-11 at 2). At the EASD School Board's next meeting on July 17, 2023, multiple members of the public criticized the EASD's Gender Support Protocols. *Id.* (citing ECF No. 15-12 at 2 and EASD, *School Board Meeting*, YouTube, at 1:50, 9:00 (July 17, 2023) (URL omitted) ("July 17, 2023 Board Meeting")). Following that meeting, the public opposition to the EASD's transgender student policies escalated. *Id.* (citing ECF Nos. 15-13–15-16).

A week later, the July 24, 2023 Board Meeting took place. ECF No. 15-17. Multiple members of the public attended and criticized the Gender Support Protocols. ECF No. 16 at 14 (citing ECF No. 15-19). At the beginning of the meeting, Tadlock spoke to "clarify" the EASD's protocols regarding transgender students. *Id.* (citing ECF No. 15-17 at 2, ECF No. 15-18, and July 24, 2023 Board Meeting at 1:13). Using a PowerPoint presentation, Tadlock discussed Title IX and the Equal Protection Clause, and explained to the crowd that the EASD was "bound" by *Whitaker*, 858 F.3d 1034. *Id.* (citing ECF No. 15-18 at 4–11 and July 24, 2023 Board Meeting at 3:11).

Nonetheless, Tadlock then assured the crowd that the EASD was not actually allowing transgender students to use restrooms matching their gender identities. *Id.* (citing ECF No. 15-18 at 15–16). Tadlock showed parents slides reading "[w]e currently have 22 students with support plans in place," "[n]o student currently has usage of the restroom or locker room with which gender they identify as part of their current support plan," and "[n]o student will ever be required to use a restroom with an individual of the opposite biological sex." ECF No. 15-18 at 15–16; ECF No. 16 at 14 (citing July 24, 2023 Board Meeting at 18:03, 18:54, 19:16). The School Board then convened a meeting in August 2023 to discuss revisions to the Gender Support Protocols. *Id.* (citing ECF No. 15-20 at 3 and ECF No. 15-21 at 4).

A few months later, in October 2023, when it most recently amended the Gender Support Protocols, the EASD changed the language in the prior version of the protocols, quoted *supra* Section 2.2, which instructed personnel "not to put any restrictions on the use of the facilities" to "not to put any *unreasonable* restrictions on the use of the facilities." *Id.* at 11 (quoting ECF No. 15-8 at 13). With the October 2023 changes, the EASD also deleted the warning "that refusing to allow a student access to and use of facilities consistent with their gender identity may be a violation of Title IX." *Id.* (citing ECF No. 15-8 at 13).

The EASD made these changes in response to complaints from students and parents about the presence of transgender students in bathrooms and locker rooms that did not correspond with their biological sex. ECF No. 31 at 2 (citing ECF No. 32 at 2). Four different families raised these complaints. *Id.* (citing ECF No. 32 at 2). In addition to these complaints, the EASD revised its policies in response to public debate in Elkhorn about students using bathrooms and locker rooms that do not correspond to their biological sex. *Id.* at 2–3 (citing ECF No. 32 at 2).

### 2.6    Plaintiff's 2023–2024 School Year

On August 29, 2023, Plaintiff and her father attended an EAMS open house. ECF No. 16 at 14–15 (citing ECF No. 15-1 at 7 and ECF No. 15-22 at 2). At the open house, EAMS Associate Principal Jessica Rima ("Rima") summoned Plaintiff and her father to meet with McBurney. *Id.* at 15 (citing ECF No. 15-1 at 7–8). McBurney informed Plaintiff and her father that a parent had complained about Plaintiff using the girls' restroom the year before. *Id.* (citing ECF No. 15-1 at 7–8). When Plaintiff confirmed that she had used the girls' restroom, McBurney reprimanded her until her father told him to stop. *Id.* (citing ECF No. 15-1 at 7–8).

During the meeting, Plaintiff's father told McBurney that he would authorize Plaintiff to use girls' restrooms and asked to amend her Gender Support Plan. *Id.* (citing ECF No. 15-1 at 8). McBurney refused and asked Plaintiff's father if he "was aware of [his] surroundings," or words to that effect, which Plaintiff's father understood to be a reference to the recent public outcry. *Id.* (quoting ECF No. 15-1 at 8 and ECF No. 15-22 at 2). Plaintiff's father asked McBurney to escalate the request to Tadlock. *Id.* (citing ECF No. 15-1 at 8 and ECF No. 15-22 at 4). The next day, McBurney conveyed Tadlock's response that Plaintiff would not be permitted to use girls' restrooms. *Id.* (citing ECF No. 15-1 at 8 and ECF No. 15-22 at 4).

Plaintiff's parents then met with McBurney and Tadlock. *Id.* (citing ECF No. 15-1 at 8 and ECF No. 15-22 at 4). Tadlock stated that the School Board would not permit Plaintiff's use of girls' restrooms at school. *Id.* (citing ECF No. 15-1 at 8–9 and ECF No. 15-22 at 4). Tadlock referenced the community opposition to transgender students' rights and told Plaintiffs' parents that there was nothing more he could do. *Id.* (citing ECF No. 15-1 at 8–9). Tadlock and McBurney unilaterally amended Plaintiff's Gender Support Plan to authorize her to access several single-occupancy "unisex" restrooms at EAMS, including one in the science lab which often has students in it, in addition to the faculty restrooms that she was already authorized to use. *Id.* (citing ECF No. 15-1 at 9 and ECF No. 15-10 at 3, 5).

As Plaintiff progressed in her gender transition, the restrictions on her restroom usage became increasingly difficult for her to bear. *Id.* at 16 (citing ECF No. 15-1 at 10–13). She experienced escalating symptoms of anxiety, depression, and Gender Dysphoria arising from being denied the use of girls' restrooms under threat of discipline. *Id.* (citing ECF No. 15-1 at 10–13). She does not like to use the "unisex" restrooms because they are

further from her classes, they call unwanted attention to her, and they single her out as different from other girls. *Id.* (citing ECF No 15-1 at 9–10).

On one occasion in December 2023, Plaintiff felt ill and almost had an embarrassing incident in the hallway because she could not use the nearest girls' restroom. *Id.* (citing ECF No. 15-1 at 10). To avoid using restrooms, she restricted her water intake, which has caused her discomfort and exposed her to dehydration and other health risks. *Id.* (citing ECF No. 15-1 at 10–11). She missed many days of school during the seventh grade because of illness and a desire to avoid school. *Id.* (citing ECF No. 15-1 at 11–12). She also experienced gender-based bullying, both at school and online, from other students. *Id.* (citing ECF No. 15-1 at 13).

While Plaintiff had mostly As in sixth grade, her grades dropped in seventh grade. *Id.* (citing ECF No. 15-23, ECF No. 15-24, and ECF No. 15-1 at 11–12). Plaintiff was particularly uncomfortable around Rima, who expressed continued hostility toward her. *Id.* (citing ECF No. 15-1 at 11). During seventh grade, Plaintiff was enrolled in a class taught by Rima. *Id.* at 16–17 (citing ECF No. 15-1 at 11, ECF No. 15-24). Because of Plaintiff's discomfort with Rima, she fell behind and ultimately dropped the class. *Id.* at 17 (citing ECF No. 15-1 at 11, ECF No. 15-24).

In January 2024, Plaintiff began receiving treatment from a therapist. *Id.* (citing ECF No. 15-1 at 2, 13, ECF No. 15-25, and ECF No. 15-26). The therapist formally diagnosed Plaintiff with Gender Dysphoria and anxiety disorder and established a treatment plan for Plaintiff. *Id.* (citing ECF No. 15-1 at 2, ECF No. 15-25, and ECF No. 15-26). The therapist reported that Plaintiff "experiences distress when her gender identified [sic] is oppressed or questioned," that Plaintiff "feels she is being discriminated and singled out" because of the restroom restrictions at school, and that Plaintiff "is

experiencing emotional distress due to this and that it is negatively affecting her mental health." *Id.* (quoting ECF No. 15-25).

As a result of this distress, when Plaintiff was at school, she became increasingly socially isolated and withdrawn. *Id.* (citing ECF No. 15-1 at 11–12). Plaintiff also missed more and more school to avoid feeling unsafe and stigmatized due to mistreatment by personnel and her peers. *Id.* (citing ECF No. 15-1 at 11–12). Since this lawsuit was filed, Plaintiff has suffered from worsening anxiety and fear and has avoided going to school altogether. *Id.* (citing ECF No. 15-1 at 13). She has been subjected to online bullying by her peers who have assumed she is the plaintiff in this case, and she fears that she will be further mistreated upon her return to school. *Id.* (citing ECF No. 15-1 at 10–11, 13). She also fears ongoing mistreatment by school staff and administrators. *Id.* (citing ECF No. 15-1 at 10–11, 13).

During the 2023–2024 school year, multiple female students expressed to EAMS staff that they were uncomfortable with having to change or use the bathroom while Plaintiff could reasonably observe them. ECF No. 31 at 5 (citing ECF No. 32 at 6). In May 2023, female students complained to their PE teacher about the prospect of a biological boy being in their bathrooms, and in June 2023, a set of parents brought similar complaints on behalf of their middle school aged son and elementary aged daughter. *Id.* (citing ECF No. 32 at 6).

During her eighth-grade year, Plaintiff's anticipated classroom assignments would continue to allow her to use the same gender-neutral bathrooms described *supra* Section 2.3. *Id.* at 4 (citing ECF No. 32 at 4).

### 2.7 Dr. Budge's Opinions

Dr. Budge submits that there is no evidence that transgender individuals' use of restrooms consistent with their gender identities harms

others. ECF No. 43 at 25. Claims that transgender students assault other students in restrooms, expose their genitals to other students, or "peek" at others' genitals in public restrooms are unsubstantiated because "there is no evidence indicating that transgender people are more likely to engage in such misconduct than cisgender people." *Id.* at 25–26. In Dr. Budge's experience, transgender individuals are more concerned with their own safety and, like young people generally, "exhibit modesty with regard to exposure of their genitals to others." *Id.* at 26. She also opines that this misconduct is controlled because it is "illegal or contrary to school policy, or may subject individuals engaging in it to discipline." *Id.*

Dr. Budge confirms Plaintiff's Gender Dysphoria diagnosis. *Id.* at 28–29. Plaintiff reported to Dr. Budge symptoms of psychological distress, bulimia nervosa, increased bouts of nausea, and suicidal ideation due to discrimination at school. *Id.* at 30, 32. Dr. Budge rates Plaintiff's depression and anxiety as "severe . . . compare[d] . . . to other youth her age." *Id.* at 30. Plaintiff also fears for her safety due to escalating publicity. *Id.* at 32. Plaintiff further told Dr. Budge that she often must wait in line to use gender-neutral restrooms, even under urgent circumstances, due to their popularity with all students. *Id.* at 32–33.

As a result, Dr. Budge opines that the EASD's "treatment of [Plaintiff] and its policies regarding her bathroom use directly caused, and continue to cause, significant psychological distress that places [Plaintiff] at risk for experiencing life-long diminished well-being and life-functioning." *Id.* at 34. She further opines that the EASD's refusal to allow Plaintiff to use girls' restrooms at school "is inconsistent with clinical standards of care for the treatment of Gender Dysphoria and has predictably resulted in emotional, social, and educational harm to [Plaintiff]." *Id.*

### 2.8 The Coalition's Concerns

The Coalition's members "support the school district's policy to separate bathrooms and locker rooms based on biological sex." ECF No. 33-1 at 2 (citing ECF No. 33-5 at 1). Many members have daughters at EAMS. *Id.* (citing ECF No. 33-7 at 1, ECF No. 33-4 at 1, ECF No. 33-2 at 1, ECF No. 33-6 at 1, ECF No. 1 at 6–7). One member avers that their[5] daughter will not use bathrooms or locker rooms at EAMS without a friend to avoid being alone with a biological boy. ECF No. 33-2 at 1–2. Another attests that their daughter stated that she is afraid for her safety and privacy if forced to share bathrooms and locker rooms with biological boys at EAMS, and that their son is worried about students of the opposite sex looking at him in the bathroom or locker room. ECF No. 33-3 at 1–2.

Another member with one child at EAMS represents that their daughter is afraid and uncomfortable about being encountered by a biological boy in the bathroom or locker room and will not change clothes with a boy in the same room. ECF No. 33-4 at 1–2. While this member's daughter would change clothes in another room, she is concerned that other girls will ask her why she left. *Id.* at 2. Another member with one child at EAMS avers that their son was subjected to substantial embarrassment when he questioned why Plaintiff was using the girls' bathroom. ECF No. 33-5 at 1, 4. This member intends to remove their other, younger daughters from swimming classes with EAMS students if the EASD is required to allow transgender students to use bathrooms and locker rooms that align with their gender identities. *Id.* at 3–5.

---

[5] The Court uses the "their" pronoun to avoid disclosing any aspect of the Coalition's members' identities, which are restricted from public view. *See supra* note 2.

Case 2:24-cv-00354-JPS     Filed 08/01/24     Page 21 of 47     Document 49

Another member attests that their daughter has stated that she is concerned about having to share bathrooms and locker rooms with biological boys at EAMS. ECF No. 33-6 at 1. Another member also affirms that their daughter has expressed concern to the member, and that their daughter has also stated that she is afraid for her safety and privacy if she is forced to share locker rooms with biological boys. ECF No. 33-7 at 1. Five of the six members who submitted declarations aver that they will remove, or will seriously consider removing, their children from EASD schools if the EASD is required to allow transgender students to use bathrooms and locker rooms that align with their gender identities. ECF No. 33-2 at 2; ECF No. 33-3 at 2; ECF No. 33-4 at 3; ECF No. 33-5 at 4; ECF No. 33-7 at 2.

**3.      LEGAL STANDARD**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, [she] will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) [she] has some likelihood of prevailing on the merits of [her] claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)).

"If a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (citing *Courthouse News Serv.*, 908 F.3d at 1068). The balancing

analysis involves a "'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in h[er] favor, and vice versa." *Id.* (citing *Ty, Inc. v. Jones Grp., Inc*., 237 F.3d 891, 895 (7th Cir. 2001)). Finally, "the balance of equities must 'tip[] in [the applicant's] favor,' and the 'injunction [must be] in the public interest.'" *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1754 (2021) (quoting *Winter*, 555 U.S. at 20).

## 4. ANALYSIS

### 4.1 Likelihood of Success on the Merits

As noted, a preliminary injunction movant must demonstrate that, inter alia, "[she] has some likelihood of prevailing on the merits of [her] claims." *Speech First*, 968 F.3d at 637 (citing *Courthouse News Serv*., 908 F.3d at 1068). "[T]he showing must be a strong one, though the applicant 'need not show that [she] definitely will win the case.'" *A.C.*, 75 F.4th at 768 (quoting *Ill. Republican Party*, 973 F.3d at 763). Plaintiff has shown a high likelihood of success on both her Title IX and Equal Protection Clause claims. The Court takes up each in turn.

#### 4.1.1 Title IX Claim

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The parties agree that the EASD receives federal funds and is a covered institution. *See* ECF No. 31 at 7. The Seventh Circuit has twice held in factually analogous cases that "discrimination against transgender persons is sex discrimination for Title IX purposes." *A.C.*, 75 F.4th at 769 (citing *Bostock v. Clayton County*, 590 U.S. 644 (2020)); *Whitaker*, 858 F.3d at 1049–50.

In *Whitaker*, the Seventh Circuit reviewed a district court's entry of a preliminary injunction in favor of a transgender high-school student who alleged that his school district's policy of forbidding him from using boys' restrooms violated Title IX and the Equal Protection Clause. 858 F.3d at 1039. The student argued that denial of access to boys' bathrooms caused him physical harm, including exacerbation of a condition that renders him susceptible to fainting and/or seizures if dehydrated, as well as educational and emotional harm. *Id.* The student, who was diagnosed with Gender Dysphoria, and his mother met with his guidance counselor to request that he be permitted to use boys' restrooms at school. *Id.* at 1040. His request was denied, and the school told him that he could only use girls' restrooms or a gender-neutral restroom, "which was quite a distance from his classrooms." *Id.* The student was concerned that using girls' restrooms would undermine his transition and that using the gender-neutral bathroom would draw unwanted attention to his transition. *Id.*

As a result, he restricted his water intake to avoid using any restroom at school. *Id.* at 1040–41. He was then diagnosed with vasovagal syncope and suffered from stress-related migraines, depression, anxiety, and suicidal ideations. *Id.* The following school year, the student exclusively used boys' restrooms until a teacher saw him and reported it to the school. *Id.* He was again told that he was not permitted to use boys' restrooms. *Id.* After the student continued to use boys' bathrooms, school security guards monitored him, and he was removed from class to discuss violations of the bathroom policy. *Id.* The school later provided the student with additional gender-neutral bathrooms to use, which, due to their distance, caused him to miss class time. *Id.* at 1041–42. They also stigmatized him, because only he had a key to use them, and caused him to fear for his safety. *Id.* at 1042.

The Seventh Circuit affirmed the district court's entry of the preliminary injunction, rejecting the school's argument that the Title IX claim failed because "Congress has not explicitly added transgender status as a protected characteristic to . . . Title IX, despite having opportunities to do so." *Id.* at 1049 (citing Student Non-Discrimination Act of 2015 S.439 114th Cong. (2015) and *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (congressional inaction "lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change")). Instead, although "[n]either the statute nor the regulations define the term 'sex,'" the student demonstrated a likelihood of success on the merits of his claim because "[a] policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Id.* at 1047, 1049–50. Such a policy also subjects transgender students to "different rules, sanctions, and treatment" than cisgender students, which violates Title IX. *Id.* at 1049–50. The court continued, holding that "[p]roviding a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act." *Id.* at 1050.

In *A.C.*, the Seventh Circuit reviewed a district court's entry of a preliminary injunction in favor of three transgender students—one 13 years old and two 15 years old—who alleged that their school districts' refusals

to grant them access to boys' bathrooms and locker rooms,[6] respectively, violated Title IX and the Equal Protection Clause. 75 F.4th at 764, 765.

The school told the 13-year-old student, who was diagnosed with Gender Dysphoria, as in *Whitaker*, that he had to use either girls' bathrooms or a unisex bathroom. *Id.* at 764. However, using girls' bathrooms exacerbated the student's Gender Dysphoria, and the unisex bathroom was far from his classes and stigmatized him because he had to ask permission and sign in to use it. *Id.* at 764–65. The student defied the school's orders and used boys' bathrooms until a staff member reported him. *Id.* at 765. The school told him that if he continued using boys' bathrooms, he would be disciplined. *Id.* The student felt isolated, and his academic performance suffered. *Id.*

The 15-year-old students, who were also diagnosed with Gender Dysphoria, used boys' bathrooms at school until school employees reprimanded them. *Id.* at 765–66. Their mother alerted the school about the Gender Dysphoria diagnoses, as well as the students' colon conditions that make bathroom access particularly sensitive, and requested that they be permitted use of boys' bathrooms and locker rooms. *Id.* at 766. The school denied the request and, as in *Whitaker*, stated that the students must use girls' bathrooms and locker rooms or the unisex bathroom. *Id.* Using girls' bathrooms and locker rooms would reveal the students to be transgender, and the unisex bathroom was far from classrooms and locked at unpredictable times. *Id.* One student suffered an embarrassing accident

---

[6]While Plaintiff ultimately seeks relief as to all school facilities, including locker rooms, that issue is not before the Court on the instant motion for a preliminary injunction, which seeks only narrow relief related to bathrooms. ECF No. 1 at 29–30; ECF No. 18; ECF No. 38 at 5. Thus, when discussing Plaintiff for the remainder of this Order, the Court refers only to bathrooms at this juncture.

because of his colon condition and not being able to get to the unisex bathroom in time. *Id.* Both students felt stigmatized and avoided using the bathroom at school. *Id.*

The Seventh Circuit again held that "discrimination against transgender persons is sex discrimination for Title IX purposes," and that the Supreme Court's decision in *Bostock*—entered between *Whitaker* and *A.C.*—holding the same in the Title VII context only strengthened that conclusion. *Id.* at 769 (citing *Bostock*, 590 U.S. 644 and *Whitaker*, 858 F.3d 1034). The court reinforced its holding in *Whitaker* by analyzing 20 U.S.C. § 1686, which is part of Title IX, and the implementing regulation, 34 C.F.R. § 106.33. *Id.* at 769–70. Section 1686 provides that "[n]otwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes," while § 106.33 permits recipients of educational funds to "provide separate toilet, locker room, and shower facilities" on the basis of sex. *Id.*

The court explained again that nothing in the case law, statute, or regulations "suggest[s] that 'sex' refer[s] only to biological sex." *Id.* at 770 (citing *Whitaker*, 858 F.3d at 1047). While sex-segregated facilities are clearly permitted, the question is "who counts as a 'boy'" and "who counts as a 'girl,'" for which the statute and regulations are silent, and "*[n]arrow definitions of sex do not account for*." *Id.* (emphasis added).[7]

---

[7]In other words, "transgender plaintiffs don't 'challenge sex-separated restrooms;' rather, they challenge the 'discriminatory exclusion' from the 'sex-separated restroom matching [their] gender identity.'" *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725, 732 (S.D. Ind. 2022), *aff'd sub nom. A.C.*, 75 F.4th 760 (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020)).

Case 2:24-cv-00354-JPS    Filed 08/01/24    Page 27 of 47    Document 49

The facts here are materially indistinguishable from the facts in *Whitaker* and *A.C.* Nonetheless, Defendants attempt to distinguish the facts, but none of their attempts is persuasive. First, they argue that "a unilateral declaration of being transgender, without a diagnosis of gender dysphoria" does not implicate Title IX. ECF No. 31 at 15. They explain that all the students in *Whitaker* and *A.C*, as well as in district court decisions applying those precedents, had been diagnosed with Gender Dysphoria "at the time they requested to use a specific bathroom." *Id.* (collecting cases). Indeed, in *Whitaker*, the court suggested that cases "where a student has merely announced that he is a different gender" may not implicate Title IX, in contrast to the case before it, where the student "ha[d] a medically diagnosed and documented condition." *Id.* at 16 (quoting *Whitaker*, 858 F.3d at 1050); *Whitaker*, 858 F.3d at 1050.

This dicta in *Whitaker* does not cast as wide a net as Defendants hope that it does. The Seventh Circuit has not held that a medical diagnosis or documented condition is *required* to use bathrooms corresponding with gender identity. In *A.C.*, the court explained that factors that may render a request for a gender-affirming facility "genuine" as opposed to a mere "announcement" include medical diagnoses, care from professionals to assist in their transitions, and that the gender identity is enduring. 75 F.4th at 773. The court did not hold that any one factor is dispositive.

Here, there is no question that Plaintiff did not merely "announce" that she is a girl. She began transitioning to her female gender identity in 2020, and in the fall of 2022, she began carrying a purse, growing out her hair, wearing feminine clothing, using female pronouns, and using a female name. Her parents attended a meeting with Ghilani on her behalf to develop a Gender Support Plan, and Plaintiff and her parents have

consistently sought to protect her right to use girls' bathrooms despite unbending resistance from Defendants and public outcry. These facts are more than sufficient to show that Plaintiff's female gender identity is genuine and that she did not merely "announce" that she is a girl.

Further, the Gender Support Protocols have never explicitly required a Gender Dysphoria diagnosis to allow a student to use the bathroom matching their gender identity. Defendants never asked Plaintiff for documentation of any condition. Defendants' reliance on that qualifier at this juncture is therefore, at best, pretextual and, at worst, disingenuous. The record—particularly Tadlock's PowerPoint discussing *Whitaker* with the public and then stating that the EASD will not follow *Whitaker*'s commands—indicates to the Court that the EASD is most concerned with public perception of its policies rather than with abiding by binding Seventh Circuit authority. This is reinforced by the fact that, in the time since the EASD became aware of Plaintiff's February 2024 clinical Gender Dysphoria diagnosis, which Dr. Budge has confirmed during this litigation, they have not changed tack and offered Plaintiff use of the restrooms matching her gender identity.

Defendants next argue that "[r]equiring a transgender student to use a gender-neutral bathroom does not in [and] of itself violate Title IX." ECF No. 31 at 17. Defendants are incorrect. The Seventh Circuit squarely held in *Whitaker* that providing gender-neutral bathrooms does not relieve a school district from liability. 858 F.3d at 1050. This holding was not premised on, as Defendants urge the Court to read it, whether the gender-neutral bathrooms are close to students' classrooms. ECF No. 31 at 17; *Whitaker*, 858 F.3d at 1050 (holding that "[p]roviding a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself

which violates the Act" and noting "[f]urther," that based on the record at bar, the gender-neutral alternatives "were not true alternatives because of their distant location to [the plaintiff's] classrooms and the increased stigmatization they caused [the plaintiff]") (emphasis added).

While EAMS has more gender-neutral bathrooms than the students' schools in *Whitaker* and *A.C.*, and they appear to be closer to classrooms and other bathrooms than in those cases, they are still an inconvenience to Plaintiff and not to cisgender students. As in *Whitaker* and *A.C.*, Plaintiff has sensitive medical conditions, including bulimia nervosa and bouts of nausea, and she experiences symptoms that require her to use the bathroom with urgency. Additionally, the gender-neutral bathrooms often have long lines. Depending on where Plaintiff is coming from, the gender-neutral bathrooms are still further away from the girls' bathrooms. Plaintiff also feels stigma, like the plaintiffs in *A.C.* and *Whitaker*, from not being permitted to use the bathroom that matchers her gender identity. Like in both *A.C.* and *Whitaker*, Plaintiff has been pulled from class, reprimanded for her bathroom use, and threatened with discipline. As a matter of common sense, being publicly pulled from class further stigmatizes her. *See A.C.*, 75 F.4th at 772. The gender-neutral bathrooms are therefore "not true alternatives" based, inter alia, on Plaintiff's inconvenience of *always* needing to find a gender-neutral bathroom no matter how far away they are, even when about to have an embarrassing accident, the long lines, and the increased stigmatization. *Id.* (citing *Whitaker*, 858 F.3d at 1050).

In other words, while Plaintiff is not singled out as the only user of gender-neutral bathrooms like in *Whitaker*, she is inconvenienced by the fact that she can *only* use bathrooms that have proven to be popular with all students and that have long lines, particularly given her medical conditions

and the associated symptoms. In other words, the EASD treats Plaintiff differently because it provides her "access to [*only*] these gender-neutral bathrooms," under threat of punishment, but does not do so as to cisgender students. *Whitaker*, 858 F.3d at 1050. And only transgender students, like Plaintiff, must receive written authorization in a Gender Support Plan to use the restroom that matchers their gender identities. *Id.* Therefore, this is simply *not* a "very factually different" case from *Whitaker* and *A.C.* but rather, as noted, a materially indistinguishable one. ECF No. 31 at 17.

Defendants and the Coalition each advance a legal argument to urge the Court that it should not straightforwardly apply *Whitaker* and *A.C.* For their part, Defendants contend that the Seventh Circuit failed to account for whether "Title IX's prohibition on sex discrimination can extend to a student's transgender status if analyzed under the Spending Clause." *Id.* at 7. "[B]ecause Title IX was enacted as an exercise of Congress' powers under the Spending Clause, private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 841 (S.D. Ind. 2019) (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005)). In other words, "[t]here can . . . be no knowing acceptance [of the terms of the contract] if a State is unaware of the conditions [imposed by the legislation on its receipt of funds]." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Defendants argue that, under this "clear-statement rule," public school districts had no notice, let alone "clear notice," that "maintaining separate bathrooms based on biological sex would threaten their federal funding." ECF No. 31 at 8, 14.

This argument is unavailing for several reasons. Initially, at this juncture, where the Court is considering solely preliminary *injunctive* relief,

the clear-statement rule does not apply. *Jackson*, 544 U.S. at 181–82 ("[*P]rivate damages actions* are available only where recipients of federal funding had adequate notice . . . .") (emphasis added) (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640 (1999)); *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 967 (9th Cir. 2010) ("[T]he Supreme Court has made clear that no notice requirement is applicable to Title IX claims that rest on an affirmative institutional decision.") (citing *Jackson*, 544 U.S. 167); *Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 44, 52–54 (2d Cir. 2023) (same).

More importantly, this Court is bound to apply Seventh Circuit precedent and cannot disregard it unless it is "powerfully convinced that the [Seventh Circuit] would overrule it at the first opportunity." *Wilson v. Est. of Burge*, 667 F. Supp. 3d 785, 882 (N.D. Ill. 2023) (quoting *Corpeno-Argueta v. United States*, 341 F. Supp. 856, 863 (N.D. Ill. 2018)). The Seventh Circuit has twice made clear its stance on the merits of a Title IX claim like Plaintiff's. Defendants' Spending Clause argument is not persuasive to this Court, and the Court doubts—and is far from powerfully convinced—that it will be for the Seventh Circuit.[8]

The Supreme Court has found notice for purposes of Spending Clause legislation from case law. *Jackson*, 544 U.S. at 182 ("Funding recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979, when we decided *Cannon* [*v. University of Chicago*, 441 U.S. 677 (1979)]."); *id.* at 169 ("Moreover, the Board should have been put on notice that it could be held

---

[8]In fact, the Seventh Circuit declined to change its stance in *A.C.* even after acknowledging courts that have agreed with Defendants' Spending Clause argument. 75 F.4th at 771 (citing *Adams by Kasper v. Sch. Bd. of St. John's Cnty.*, 57 F.4th 791 (11th Cir. 2022)).

liable for retaliation by the fact that this Court's cases since *Cannon*[, 441 U.S. 677] have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination . . . .") (citation omitted). Circuit courts have similarly analyzed their own Circuit-level case law as part of the clear-statement rule analysis. *See, e.g.*, *Kentucky v. Yellen*, 54 F.4th 325, 354–57 (6th Cir. 2022).

The Southern District of Indiana rejected the argument that Defendants make now on the basis that *Whitaker* alone should have provided the requisite notice to the school district. *J.A.W.*, 396 F. Supp. 3d at 842 (citing *Whitaker*, 858 F.3d at 1049–50). The Court agrees with that analysis and adds that the fact that the EASD agreed to comply with *Whitaker* and Title IX for years—including by training its employees and administrators on the same—suggests that it "cannot now avoid the obligations to which it previously agreed by arguing . . . an invalid exercise of the Spending Clause." *Cnty. Sch. Bd. of Henrico Cnty. v. RT*, 433 F. Supp. 2d 692, 706 (E.D. Va. 2006) (citing *Jackson*, 544 U.S. at 183–84). Indeed, in *A.C.*, the Seventh Circuit observed that "the school district's insistence upon the need for executive or congressional guidance was undermined" by the facts that—like in this case—"*Whitaker* ha[d] been controlling law in the Seventh Circuit since 2017" and the school district's county had "crafted an effective written policy to manage gender-affirming facility access despite the lack of additional rulemaking or legislation." 75 F.4th at 774. Thus, in addition to the reasons above, the Court rejects Defendants' attempt to raise a Spending Clause argument on the merits.

Next, the Coalition raises a putative Department of Education (the "Department") rule set to go into effect on August 1, 2024, the preamble of which "explains that the Department interprets these provisions as

requiring schools to allow transgender students to use whatever facilities they identify with." ECF No. 33-1 at 11 (citing *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474, 33,817–33,821 (April 29, 2024)). The Coalition notes that the rule has already been challenged in at least eight separate lawsuits. *Id.* at 12 & n.6 (collecting cases). It argues that "[i]f any of the courts stay the new rule or enjoin its implementation, that will obviously be directly relevant to this case," and that, moreover, "whichever way the lower courts rule, the issue is very likely headed to the Supreme Court." *Id.* It posits that "[i]f the Court holds that the new rule is invalid and inconsistent with the text of Title IX . . . it will abrogate both *Whitaker* and [*A.C.*]." *Id.* at 13.

Defendants later joined this argument by alerting the Court to a preliminary injunction entered in *State v. United States Department of Education, et al.*, No. 24-CV-4041-JWB (D. Kan.) ("*Kansas*"), ostensibly enjoining the Department's new rule as to, as pertinent here, EAHS. ECF No. 46, 46-1, 46-2, 46-3 at 18 (listing EAHS as a school to which the preliminary injunction applies). In response, Plaintiff argues not only that the new rule is immaterial to her private statutory Title IX claim, but that, by its terms, the *Kansas* preliminary injunction is to apply only to *Department* enforcement of the new rule at *EAHS*, not the EASD's policies as pertinent to Plaintiff's statutory Title IX claim. ECF No. 47 at 2–3. Indeed, by its express terms, the *Kansas* order granting the preliminary injunction provides that "nothing in this order limits the ability of any school to adopt or follow its own policies, or otherwise comply with applicable state or local laws or rules regarding the subjects addressed herein. Rather, it simply prohibits *Defendants* from demanding compliance with the [rule] by the *schools* affected by this order." ECF No. 46-2 at 45–46 (emphasis added). The

Court is thus satisfied that the terms of the *Kansas* preliminary injunction do not apply to the *policies* of school *districts* encompassing the listed schools, like the EASD, or inhibit the ability of private plaintiffs, like Plaintiff, to bring statutory Title IX claims.

The Court, at any rate, rejects the argument on its merits—both from Defendants and the Coalition—once again on the simple basis that the reasoning in *Kansas*, the reasoning proffered by Defendants, and the reasoning that the Coalition hopes the Supreme Court will adopt, is contrary to the Seventh Circuit's decisions in *Whitaker* and *A.C. See Wilson*, 667 F. Supp. 3d at 882; ECF No. 31 at 11–14 (arguing that "sex" means "biological sex" for purposes of the Spending Clause's notice requirement). The *Kansas* court held that the term "sex" in Title IX means "biological sex" and not "gender identity or sexual orientation." ECF No. 46-2 at 18. As explained above, that is not the law in the Seventh Circuit, and any speculation about what the law may be if this issue goes to the Supreme Court has no bearing on this Order.

Accordingly, for all these reasons, Plaintiff has established a likelihood of success on her Title IX claim.

### 4.1.2 Equal Protection Clause Claim

"The Equal Protection Clause of the Fourteenth Amendment 'is essentially a direction that all persons similarly situated should be treated alike.'" *Whitaker*, 858 F.3d at 1050 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "It therefore[] protects against intentional and arbitrary discrimination." *Id.* (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). "Generally, state action is presumed to be lawful and will be upheld if the classification drawn by the statute is

rationally related to a legitimate state interest." *Id.* (citing *City of Cleburne*, 473 U.S. at 440).

However, the rational basis test "does not apply when a classification is based on sex." *Id.* "When a sex-based classification is used, the burden rests with the state to demonstrate that its proffered justification is 'exceedingly persuasive.'" *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996) and citing *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 577 (7th Cir. 2014)). "This requires the state to show that the 'classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.* (quoting *Virginia*, 518 U.S. at 524). "It is not sufficient to provide a hypothesized or post hoc justification created in response to litigation." *Id.* (citing *Virginia*, 518 U.S. at 533). "Nor may the justification be based upon overbroad generalizations about sex." *Id.* (citing *Virginia*, 518 U.S. at 533). "Instead, the justification must be genuine." *Id.* (citing *Virginia*, 518 U.S. at 533).

In *Whitaker*, and again in *A.C.*, the Seventh Circuit concluded that "the record for the preliminary injunction shows sex stereotyping," which is sufficient to apply heightened scrutiny. *Whitaker*, 858 F.3d at 1051 ("[T]his case does not require us to reach the question of whether transgender status is per se entitled to heightened scrutiny. It is enough to [say] that . . . the record for the preliminary injunction shows sex stereotyping . . . . [T]here is no requirement that every girl, or every boy, be subjected to the same stereotyping. It is enough that [plaintiff] has experienced this form of sex discrimination.") (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)); *A.C.*, 75 F.4th at 772 ("[The school district's] access policy relies on sex-based classifications and is therefore subject to heightened scrutiny.") (citing

*Whitaker*, 858 F.3d at 1051). Although Defendants urge the Court that it "is not bound by the choices of the *Whitaker* and [*A.C.*] panels to 'assume' that intermediate scrutiny applies," the Court disagrees and declines Defendants' invitation to part way with binding law in this Circuit. ECF No. 31 at 20. As in *Whitaker* and *A.C.*, the Court finds that the record in this case shows sex stereotyping and that Plaintiff has experienced sex discrimination. Thus, heightened scrutiny applies.

Under the heightened scrutiny analysis, Defendants argue that separating bathrooms based on biological sex is substantially related to the important government objective of protecting students' privacy interests. ECF No. 31 at 21 (citing *Adams*, 57 F.4th at 804 ("The protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective.")).

The Seventh Circuit considered the government's interest in protecting students' privacy in both *Whitaker* and *A.C.* In *Whitaker*, the court found that the privacy argument was "based upon sheer conjecture and abstraction." 858 F.3d at 1052. The student had been using the boys' bathroom for months with no complaints from *students* and was only forced to stop when a teacher raised the issue. *Id.* The school district also only proffered one parental complaint, as well as vocal opposition to the policy at a school board meeting, but, again, it had not received any complaints from other students. *Id.* This was insufficient in the court's eyes, *id.*, which further reasoned that

> [a] transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates

performing their bodily functions. Or for that matter, any other student who uses the bathroom at the same time. Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall. *Nothing in the record suggests that the bathrooms at [the school] are particularly susceptible to an intrusion upon an individual's privacy.*

*Id.* (emphasis added). The Seventh Circuit held similarly in *A.C.*, finding the privacy concerns of other students "entirely conjectural" given that no students had complained about the plaintiffs' bathroom use. 75 F.4th at 772–73 (citing *Whitaker*, 858 F.3d at 1052).

Presumably to circumvent these findings, Defendants argue that EAMS bathroom stalls have gaps between the panels such that students can see into a stall while walking past it or see out of a stall while inside it:

 

ECF No. 31 at 22–23; *see also* ECF No. 32-1 at 2–3. Defendants also state that because the EAMS girls' locker room is not large enough to accommodate all female students, some students change in and out of their clothing in the girls' restrooms. ECF No. 31 at 23. Female students have also expressed to staff that they are uncomfortable with changing or using the bathroom while Plaintiff could observe them. *Id.* The Coalition joins in Defendants'

privacy concerns and, as summarized *supra* Section 2.8, submits several declarations of parents describing their own, as well as their children's, concerns. ECF No. 33-1 at 7–10.

Based on the Coalition's members' declarations, as well as the record evidence that some students have expressed discomfort about Plaintiff using girls' bathrooms to their teachers, the Court does not find that the privacy concerns are conjectural, and the public outcry on this issue in Elkhorn indicates that they are not a post hoc justification created in response to litigation. *See Whitaker*, 858 F.3d at 1050 (quoting *Virginia*, 518 U.S. at 533). While the Court is suspicious of the highly boilerplate nature of the Coalition's declarations, the Seventh Circuit has indicated that even *allegations* of complaints from other students may suffice to tip the scales away from "sheer conjecture and abstraction." *Cf. id.* at 1052 ("[N]either party has offered any evidence *or even alleged* that the School District has received any complaints *from other students*.") (emphasis added).

The Court further appreciates both Defendants' and the Coalition's vehement defense of the "right to privacy both as to one's unclothed body and as to one's 'partially clothed body.'" ECF No. 33-1 at 7 (quoting *Doe v. Luzerne County*, 660 F.3d 169, 176 (3d Cir. 2011) and citing *Poe v. Leonard*, 282 F.3d 123, 138 (2d Cir. 2002)); ECF No. 31 at 20–23. However, the Court follows the Seventh Circuit's reasoning in *Whitaker*: "[w]hile [the Court] certainly recognizes that the [EASD] has a legitimate interest in ensuring bathroom privacy rights are protected, this interest must be weighed against the facts of the case and not just examined in the abstract, to determine whether this justification is genuine." 858 F.3d at 1052. Here, for the reasons set forth below and given the availability of less discriminatory

alternatives, the EASD's justification is not only ingenuine, but also far from "exceedingly persuasive." *Id.* (quoting *Virginia*, 518 U.S. at 533).

The restroom structural stall gaps at EAMS look no different than those in most public buildings. As Plaintiff points out, privacy guards are available at a low cost and could be applied to every stall. ECF No. 38 at 11 & n.2. The Seventh Circuit's analysis in *Whitaker* rings particularly true in response to this concern: any student in any restroom, regardless of sex, is subject to a potential violation of their privacy rights with respect to stall gaps in the bathrooms. *See Whitaker*, 858 F.3d at 1052. Dr. Budge opines that not only are concerns about transgender students "peeking" at others in restrooms unsubstantiated, but also that these concerns are better controlled through disciplinary action, particularly given that this conduct may be illegal, than through discriminatory practices. This is common sense. *See A.C.*, 75 F.4th at 773 ("If a student enters a girls' locker room and engages in misconduct, that student has violated school rules regardless of whether the student is a girl who is properly in the space, a boy who is improperly in the space, or a boy who pretends to be a transgender girl to gain school-authorized access to the space.").

Common sense equally dictates that students who must change clothing in the bathroom because the locker room is full can use stalls— enhanced, if the EASD chooses, by privacy guards—or the gender-neutral restrooms. These students could themselves choose to use gender-neutral restrooms at any time. Any argument that this is not a reasonable nondiscriminatory alternative for these students serves only to bolster Plaintiff's claim that it is not a reasonable nondiscriminatory alternative for her. The availability of these nondiscriminatory alternatives shows that the

EASD's policy is not substantially related to the achievement of its privacy objectives. *See Whitaker*, 858 F.3d at 1050 (quoting *Virginia*, 518 U.S. at 524).

This is especially so given that many of the Coalition's members who have submitted declarations are parents of boys, who would not be in the girls' bathroom with Plaintiff, or are parents of younger children participating in extracurriculars at EAMS who may have their own separate confusion or privacy concerns about using bathrooms alongside older students with bodies in different stages of development. *See Whitaker*, 858 F.3d at 1052–53 ("[I]f the School District's concern is that a child will be in the bathroom with another child who does not look anatomically the same, then it would seem that separate bathrooms also would be appropriate for pre-pubescent and post-pubescent children who do not look alike anatomically. But the School District has not drawn this line."). Because the EASD's policy is not substantially related to the achievement of its asserted privacy objective, its policy does not survive heightened scrutiny.

Accordingly, for all these reasons, Plaintiff has established a likelihood of success on her Equal Protection Clause claim.

### 4.2    Irreparable Harm and Inadequate Remedies at Law

Next, a preliminary injunction movant must demonstrate that she has "no adequate remedy at law" and that she likely "will suffer irreparable harm if the injunction is not granted." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003) (citing *Prometak Indus., Ltd.*, 300 F.3d at 811 and *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)); *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (quoting *Whitaker*, 858 F.3d at 1044). "Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Foodcomm Int'l*, 328 F.3d at 304 (citing *Roland Mach. Co. v. Dresser Indus.*, 749

F.2d 380, 386 (7th Cir. 1985)). Similarly, irreparable harm is that which "cannot be repaired" and "for which money compensation is inadequate." *Orr*, 953 F.3d at 502 (7th Cir. 2020) (quoting *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997)).

Defendants argue that the number and location of gender-neutral bathrooms prevents any alleged harm. ECF No. 31 at 26. They also submit that the *Whitaker* and *A.C.* plaintiffs, unlike Plaintiff, had medical conditions demonstrating that they "genuinely needed the requested accommodation of using the boy's bathroom." *Id*. However, for the reasons explained *supra* Section 4.1.2, these arguments are baseless.[9]

Plaintiff has submitted a plethora of evidence—including John Doe's declaration, her own declaration, treatment notes and diagnoses from her treating therapist, her academic records, and Dr. Budge's declaration— demonstrating that she is suffering, and will continue to suffer, harm as a result of the EASD's failure to follow binding Seventh Circuit case law and permit her to use girls' bathrooms. Her grades have fallen, she has dropped out of a class to avoid being around an administrator who makes her uncomfortable, her bouts of nausea, bulimia nervosa, and other medical conditions have been exacerbated, she has developed worsening anxiety and depression as well as suicidal ideations, and she has been bulled online. She has missed class time to travel to gender-neutral bathrooms to change

---

[9] Defendants' assertion that Plaintiff "has not made *any* . . . showing" of a medical need for bathrooms other than the gender-neutral bathrooms is patently false. ECF No. 31 at 26 (emphasis added). While Defendants are free to, and have, challenged the *sufficiency* of Plaintiff's evidence, in the face of the plethora of evidence of her medical conditions and symptoms, a statement that she has made no showing *at all* goes beyond obfuscation and verges into dishonesty. Defendants must always exhibit candor and professionalism with the Court and the parties, and the Court expects the same for the remainder of these proceedings.

(and to be reprimanded by administrators for her bathroom use), and she has avoided school altogether on occasions.

These facts are more than sufficient to demonstrate that Plaintiff will continue to suffer irreparable harm absent a preliminary injunction and that a remedy at law will be seriously deficient given the nature of the "*prospective* harm" as Plaintiff prepares to begin her eighth-grade school year. *See Whitaker*, 858 F.3d at 1044–46; *A.C.*, 75 F.4th at 774. Accordingly, Plaintiff has established these factors.

### 4.3 Balancing the Equities

The Court now turns to the final inquiry, which is whether "the balance of harms favors [the plaintiff] or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016) (citing *ACLU of Ill. v. Alvarez*, 769 F.3d 583, 589 (7th Cir. 2012)). In *Whitaker* and *A.C.*, the Seventh Circuit found the harms proffered by the respective schools—harm to students' privacy rights and harm to parents' "right to direct the education and upbringing of their children"—speculative and unpersuasive. *Whitaker*, 858 F.3d at 1054; *A.C.*, 75 F.4th at 774. In *Whitaker*, the school district had supplied no evidence of student privacy complaints or instances of parents having asserted their right to direct their children's education. 858 F.3d at 1054. The Seventh Circuit was also persuaded by amici with "experience implementing inclusive bathroom policies" and "grappl[ing] with the same privacy concerns," but who "uniformly agree that the frequently-raised and hypothetical concerns about a policy that permits a student to utilize a bathroom consistent with his or her gender identity have simply not materialized." *Whitaker*, 858 F.3d at 1054–55. In *A.C.*, there was a similar lack of substantiating evidence, and the Seventh

Circuit further independently reasoned that "A.C.'s presence in the boys' bathroom did not threaten . . . privacy interests." 75 F.4th at 774.

Here, Defendants and the Coalition raise the same harms. ECF No. 31 at 27–30; ECF No. 33-1 at 7–10. As with its Equal Protection Clause analysis, *see supra* Section 4.2.1, the Court does not find the proffered harms speculative in light of the Coalition's declarations. However, balancing the equities here nevertheless weighs firmly in favor of Plaintiff.

The EASD implemented inclusive Gender Support Protocols for years without issue, indicating that the Seventh Circuit's reasoning in *Whitaker* and Dr. Budge's opinions in this case about how alleged harms materialize—or fail to materialize—*in practice* are correct. *See also, e.g., A.C.*, 773 ("[T]he district is fighting a phantom. Gender-affirming facility access does not implicate the interest in preventing bodily exposure, because there is no such exposure. This is unlike [a case] where bodily exposure was expressly and directly at issue. There is no evidence that any students will be exposed to A.C. or vice versa.") (citing *Tagami v. City of Chicago*, 875 F.3d 375 (7th Cir. 2017)). In practice, students maintain modesty in the bathroom by using a stall and maintain modesty when changing clothes by changing where other students cannot see them. Students who "peek" at other students are controlled by knowing that they could be disciplined for this conduct.

Only a single declaration from the Coalition specifically and directly references Plaintiff and her bathroom use, rather than the bathroom use of transgender students generally, and that single declaration asserts the experience of a male student who would not have had to share a bathroom with Plaintiff in the first place. ECF No. 33-5 at 1, 4. While Defendants submit evidence of complaints from some female students to teachers about

Plaintiff using girls' restrooms, there is no evidence that Plaintiff, when she did use girls' bathrooms, did anything other than enter a stall and close the door. *See Whitaker*, 858 F.3d at 1054 ("Nor have [the defendants] demonstrated that [the plaintiff's] presence has *actually* caused an invasion of any other student's privacy.") (emphasis added). Students who have these fears may, like Plaintiff, use a gender-neutral bathroom at any time, or the EASD may install privacy guards at minimal cost. *See A.C.*, 75 F.4th at 773 ("[The school] has not identified how A.C.'s presence behind the door of a bathroom stall threatens student privacy.").

Simply put, the Court is persuaded by the reasoning in *Whitaker*, *A.C.*, and Dr. Budge's declaration in this case that the public is best served when all students are treated equally. The remaining declarations from the Coalition describe generalized (and, frankly, boilerplate, *see supra* Section 4.1.2) fears, and there is no evidence that these fears will materialize. Conversely, Plaintiff's harm *has* materialized and will continue to do so absent the entry of a preliminary injunction. *See supra* Section 4.2. Thus, the Court has little difficulty concluding that balancing the equities as to all parties and the public weighs in favor of Plaintiff.

5.    **CONCLUSION**

For the reasons explained above, the Court will grant Plaintiff's motion for a preliminary injunction. The Court will herein enter a preliminary injunction consistent with Plaintiff's proposed order and, to comply with Rule 65(d)(1)(C)'s separate document requirement, the Court will issue a separate order embodying the injunction contemporaneously with this Order. ECF No. 18; *see MillerCoors LLC v. Anheuser-Busch Cos., LLC*, 940 F.3d 922, 922–23 (7th Cir. 2019) (collecting cases)).

Under Rule 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Plaintiff requests that the Court waive the bond requirement, which the Court may do when it is "satisfied that there's no danger that the opposing party will incur any damages from the injunction." *Newman v. Nazcr Trac Prop. Owners Ass'n, Inc.*, 601 F. Supp. 3d 357, 368 (E.D. Wis. 2022) (quoting *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010)). Defendants do not object to the Court waiving the bond requirement. ECF No. 31 at 30. Although installing privacy guards, as the Court discussed *supra* Section 4.1.2, may cost the EASD a negligible amount of money if it chooses to do so, the Court will take Defendants at their word and waive the bond requirement.

Accordingly,

**IT IS ORDERED** that Plaintiff Jane Doe, by and through her parents and next friends, John Doe and Jill Doe's motion for a preliminary injunction, ECF No. 15, be and the same is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that Plaintiff Jane Doe, by and through her parents and next friends, John Doe and Jill Doe's motions to seal, ECF Nos. 13, 40, be and the same are hereby **GRANTED**; all affected declarations and/or attachments shall remain sealed pending further order of the Court;

**IT IS FURTHER ORDERED** that the Empowered Community Coalition, U.A.'s motion to restrict, ECF No. 34, be and the same is hereby **GRANTED**; all affected declarations and/or attachments shall remain restricted pending further order of the Court;

**IT IS FURTHER ORDERED** that the Empowered Community Coalition, U.A.'s motion for leave to file an amicus brief, ECF No. 33, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Elkhorn Area School District (the "EASD") and its officers, administrators, employees, and agents, are hereby **RESTRAINED** and **ENJOINED** from enforcing any policy, practice, protocol, or custom of the EASD or Elkhorn Area Middle School ("EAMS") that denies Plaintiff Jane Doe the ability to access and use girls' restrooms at EAMS or any other EASD school that she may attend in the future, or otherwise denying or restricting her access to girls' or women's restrooms at school or on school trips;

**IT IS FURTHER ORDERED** that this preliminary injunction will take effect immediately and remain in place for the pendency of this litigation; and

**IT IS FURTHER ORDERED** that the Court waives the security bond requirement under Federal Rule of Civil Procedure 65(c).

Dated at Milwaukee, Wisconsin, this 1st day of August, 2024.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge