UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

JANE DOE, a minor, by her parents and next
friends, JOHN DOE and JILL DOE,

        Plaintiff,

     v.                                 Case No.: 24-CV-354

ELKHORN AREA SCHOOL DISTRICT and
JASON TADLOCK, in his individual capacity.

        Defendants.

_____

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

_____

# INTRODUCTION

Plaintiff, Jane Doe, is a fourteen-year-old biological male, who identifies as female. Plaintiff currently attends Elkhorn Area Middle School in the Defendant Elkhorn Area School District (the "District"). Prior to this Court's preliminary injunction, the District did not permit Plaintiff to utilize the bathrooms or locker rooms assigned to biological female students. Plaintiff now moves for summary judgment as to liability largely relying on the same arguments raised in support of the prior motion for preliminary injunction.

The District and its Superintendent, Jason Tadlock (collectively "Defendants"), acknowledge that in its Order on the preliminary injunction, this Court concluded that it was bound by the Seventh Circuit's interpretation of Title IX and the Equal Protection Clause to find that those laws require transgender students be allowed to utilize the bathroom that corresponds to their gender identity. Defendants maintain that *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) and *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) were wrongly decided and do not support that students claiming to be transgender are automatically entitled to use the bathroom and locker room of their choice, or that a boy that identifies as a girl is "similarly situated" to other girls for equal protection purposes.[1]

In addition, there have been developments in Federal law that cannot be ignored. On January 20, 2025, President Trump issued an Executive Order that clarifies that the Federal government only recognize two sexes, male and female, and that sex does not include the concept of gender identity. This clarification explicitly extends to Title IX and impacts any equal

---

[1] While this Court has rejected many of the arguments that Defendants will raise *infra*, Defendants nevertheless continue to make these points to preserve these arguments for appeal. *See Wilson v. Williams*, 182 F.3d 562, 567 (7th Cir. 1999) (explaining that arguments that were actually presented to the district court are preserved for appeal).

1

protection analysis.  Thus, the law has changed, and Plaintiff is not entitled to any past compensatory or forward-looking injunctive or declaratory relief.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).  A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant.  *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

## ARGUMENT

### I.   THE 2025 EXECUTIVE ORDERS CLARIFIED THAT TITLE IX ONLY RECOGNIZES TWO SEXES – MALE AND FEMALE – AND THAT SEX DOES NOT INCLUDE THE CONCEPT OF GENDER IDENTITY.

On January 20, 2025, President Trump issued the Executive Order, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." (the "Executive Order").[2]  This executive order came about because whether Title IX encompasses gender identity has been an ongoing question that has split the circuits.  *Compare Martinsville*, 75 F.4th at 760; *Whitaker*, 858 F.3d at 1034; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020) *to Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir.

---

[2]  The full text of this Executive Order is publicly available at https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.  The Court can take judicial notice of a Presidential Executive Order published on the government's website.  *See Indiana v. Biden*, 652 F. Supp. 3d 995, 1007 (S.D. Ind. 2023) (taking judicial notice of a federal executive order).

2

2022); *Alabama v. United States Sec'y of Educ.*, No. 24-12444, 2024 U.S. App. LEXIS 21358 (11th Cir. Aug. 22, 2024).

A.    **The Trump Executive Orders Definitively Define Sex As Biological Classifications, Not Gender Identity.**

While the "President has no law-making authority . . . The use of executive orders may be employed by the President in carrying out his constitutional obligation to see that the laws are faithfully executed and to delegate certain of his duties to other executive branch officials" as long as the "executive order [does not] impose legal requirements on the executive branch that are inconsistent with the express will of Congress." *Utah Ass'n of Counties v. Bush*, 316 F. Supp. 2d. 1172, 1184 (D. Utah 2004); *see also California v. Bernhardt*, 472 F. Supp. 3d 573, 605 (N.D. Cal. 2020) ("A president's Executive Order cannot impair or otherwise affect statutory mandates imposed on [an agency] by Congress.").

The January 20, 2025, Executive Order is not inconsistent with the express will of Congress. Congress did not define the term "sex" in Title IX, but the Executive Order now does, providing: "It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality." Sec. 2. To that end, the Executive Order declares that the following relevant definitions govern all federal laws:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

3

Sec. 2(a), (g).

> The Executive Order also dictates that:
>
> (b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

Sec. 3(b).

The Executive Order rejected the proposition that the holding in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020) has any application to laws other than Title VII:

> (f) The prior Administration argued that the Supreme Court's decision in *Bostock v. Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock v. Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

Sec. 3(f). Finally, the Executive Order requires that "Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity." Sec. 4(d).

On January 29, 2025, President Trump issued another executive order, titled "Ending Radical Indoctrination in K-12 Schooling."[3] This executive order built upon the January 20, 2025 Executive Order's clarification of the term sex, requiring the Attorney General to "coordinate with State attorneys general and local district attorneys in their efforts to enforce the law and file

---

[3] The full text of this Executive Order is publicly available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-indoctrination-in-k-12-schooling/.

4

appropriate actions against K-12 teachers and school officials who violate the law by . . . otherwise unlawfully facilitating the social transition of a minor student." Sec. 3(c)(iii). Correspondingly, "'social transition' means the process of adopting a 'gender identity' or 'gender marker' that differs from a person's sex," including "use of intimate facilities and accommodations such as bathrooms or locker rooms specifically designated for persons of the opposite sex." Sec. 2(e). In other words, the Executive Order made it clear that permitting transgender students to use the bathroom and locker rooms consistent with their gender identity actually violates Title IX.

On February 4, 2025, the United States Department of Education Office for Civil Rights issued a Dear Colleague Letter advising that it "will enforce Title IX under the provisions of the 2020 Title IX Rule, rather than the 2024 Title IX Rule" and that it will be enforcing Title IX consistent with the Executive Order, specifically "the reality that there are two sexes, male and female, and that these sexes are not changeable and are grounded in fundamental and incontrovertible reality."[4]

Finally, on February 5, 2025, President Trump issued another executive order, "Keeping Men Out of Women's Sport," ordering the Secretary of Education to "take all appropriate action to affirmatively protect all-female athletic opportunities and all-female locker rooms." Sec. 1, 3(a)(ii).[5] This executive order means that school districts risk forfeiting their federal funding if they permit transgender women to share locker rooms with biological women.

The executive orders, in conjunction with the February 4, 2025, Dear Colleague Letter, make it abundantly clear that "sex" under Title IX does not encompass gender identity, and that

---

[4] The full text of the Dear Colleague Letter is publicly available at https://www.ed.gov/media/document/title-ix-enforcement-directive-dcl. Like executive orders, the Court can take judicial notice of dear colleague letters issued by federal agencies. *See Tanyi v. Appalachian State Univ.*, No. 5:14-CV-170RLV, 2015 U.S. Dist. LEXIS 95577, at *15 (W.D.N.C. July 22, 2015) (noting that a district court can take judicial notice of a dear colleague letter prepared by the United States Department of Education).

[5] The full text of this Executive Order is publicly available at https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports/.

boys cannot be allowed to use girls' bathrooms and locker rooms. It is also equally clear that under an equal protection analysis, a boy who identifies as transgender cannot point to biological girls as comparators.

**B.    The Executive Orders Have The Force Of Law.**

Executive orders have the force of law when based on congressionally delegated authority. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 99 S. Ct. 1705, 60 L. Ed. 2d 208 (1979). However, the President's executive order does not have to be tied to a specific statutory provision. *See id.* at 308. The pertinent inquiry, the Supreme Court explains, is whether executive action is "reasonably within the contemplation" of any "statutory grants of authority." *Id.* at 306.

The January 20, 2025 Executive Order was issued: "By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code."[6] "Presidents have various tools—including 'presidential findings, national security instruments, presidential directives, presidential proclamations, presidential memoranda, and executive orders, among others—that, under the appropriate circumstances, have the force and effect of law.'" *Orbital ATK, Inc. v. Walker*, No. 1:17-cv-163 (LMB/IDD), 2017 U.S. Dist. LEXIS 108425, at *23-24 (E.D. Va. July 12, 2017) (citing Erica Newland, Note, *Executive Orders in Court*, 124 Yale. L. J. 2026, 2045 (2015)).

There is no question that the Executive Order was passed pursuant to the President's legitimate power, and therefore, it has the force of law and the power of statute:

> The President, of course, is the head of the Executive Branch, and in that capacity he has great powers with respect to its management. *See, e.g.,* 5 U.S.C. § 901(d) (Presidential power with respect to executive reorganization). On that basis, an Executive Order, if issued pursuant to legitimate Presidential authority, would be **accorded the force and effect given to a statute enacted by Congress**.

---

[6] 5 U.S.C. § 7301 states: "The President may prescribe regulations for the conduct of employees in the executive branch."

6

> *Association for Women in Science v. Califano*, 185 U.S. App. D.C. 19, 566 F.2d 339, 344 (D.C.Cir.1977).

*Am. Fed'n of Gov't Emps. v. Freeman*, 498 F. Supp. 651, 658 (1980) (emphasis added). The Unites States Court of Appeals for the District of Columbia has reached a similar conclusion that an executive order has the force and effect of a statute:

> Thus, the action by the President in this instance [an executive order] has a distinct statutory foundation; indeed, it is to be accorded the force and effect of a statute. *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 & n.1 (5th Cir.), *cert. denied*, 389 U.S. 977, 19 L. Ed. 2d 471, 88 S. Ct. 480 (1967); *see Old Dominion Branch No. 496, National Association of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5, 41 L. Ed. 2d 745, 94 S. Ct. 2770 (1974) (an executive order such as this 'is plainly a reasonable exercise of the President's responsibility for the efficient operation of the Executive Branch').

*Ass'n for Women in Sci. v. Califano*, 185 U.S. App. D.C. 19, 566 F.2d 339, 344 (1977); *see also Legal Aid Soc'y v. Brennan*, 381 F. Supp. 125, 130 (N.D. Cal. 1974) ("Hence, the court concludes that Executive Order 11246 was issued pursuant to constitutional and statutory authority, and has the full force and effect of law."); *Uniroyal, Inc. v. Marshall*, 482 F. Supp. 364, 368 (D.D.C. 1979) (explaining that executive orders have the force of law).

As a matter of law, the executive orders issued by President Trump in 2025 have the force of law.

## II. THIS COURT MUST APPLY THE LAW IN EFFECT AT THE TIME OF ITS DECISION, MAKING THE HOLDINGS IN *WHITAKER* AND *MARTINSVILLE* NUGATORY.

Plaintiff argues, without support, that the holdings in *Whitaker* and *Martinsville* are "controlling precedent on the issues presented in this case." [ECF 57, p. 1]. Plaintiff's approach ignores that a district court is to apply the law in effect at the time of its decision, not a former law:

> The Supreme Court in *Bradley v. School Bd. of City of Richmond*, 416 U.S. 696, 711, 40 L. Ed. 2d 476, 94 S. Ct. 2006 (1974), stated:

7

'[A] court is to apply the law in effect at the time it renders [its] decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.'

Although the holding in *Bradley* specifically applied to the retroactivity of a law in effect at the time a direct appeal is pending, there is no reason why the rule should not also apply to the retroactive application of legislation by a district court. In any case, a statute will be applied retroactively if this is the clear and manifest intention of Congress. *United States v. Security Industrial Bank*, 459 U.S. 70, 79-80, 74 L. Ed. 2d 235, 103 S. Ct. 407 (1982).

*Wolf v. J.I. Case Co.*, 617 F. Supp. 858, 863-64 (E.D. Wis. 1985).

In *Bradley*, the plaintiff had sued the defendant school district over desegregation issues. The district court, using its equity powers, had granted plaintiffs' requests for attorneys' fees in the case and the school district appealed. While the matter was on appeal before the Fourth Circuit, the Education Amendments of 1972, and in particular § 718 of Title VII of the Emergency School Aid Act was enacted by Congress. This provision allowed for the award of attorneys' fees in desegregation suits. The Fourth Circuit held that § 718 was not applicable because there were no orders pending or appealable when the Act became effective. The Supreme Court reversed, holding that "we must reject the contention that a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature." *Bradley v. Richmond Sch. Bd.*, 416 U.S. 696, 715, 94 S. Ct. 2006, 40 L.Ed.2d 476 (1974).

Here, the law itself changed on January 20, 2025. While the Seventh Circuit interpreted Title IX in *Whitaker* and *Martinsville*, its interpretation of Title IX is of no import because the law itself changed. Although retroactive application of laws is almost entirely discussed in case law in terms of legislative enactments, because an executive order is "accorded the force and effect given to a statute enacted by Congress," the district court must apply an executive order in effect at the time of its decision, not a former law. *Ass'n for Women in Sci.*, 566 F.2d at 344. When a change in law, like the Executive Order, occurs precedents like *Whitaker* and *Martinsville* no

longer bind lower courts. *See Stanley v. City of Sanford*, 83 F.4th 1333, 1341, 30 Fla. L. Weekly Fed. C 331 (11th Cir. 2023) ("It is of course true that when Congress amends a statute, we need not follow decisions interpreting discarded statutory language.); *United States v. Woodard*, 938 F.2d 1255, 1258 n.4 (11th Cir. 1991) ("[A] clear change in the law by Congress could . . . justify a panel of this court in not following an earlier panel's decision, where the prior panel's decision was based on legislation that had been changed or repealed.").

## A.    The Definition Of "Sex" Under Title IX Applies To Pending Cases.

The concept of whether a new law is to be given retroactive application is nuanced, but the concept of retroactively applying an executive order has been recognized. Courts have considered whether to give retroactive effect to executive orders and have found that they have retroactive application to pending lawsuits. In *Sea-Land Serv., Inc. v. Interstate Commerce Comm.*, 238 U.S. App. D.C. 165, 738 F.2d 1311, 1315 (1984), the court applied a Presidential executive order retroactively to the pending litigation, holding that:

> The correct principle governing this case is instead provided by a long line of Supreme Court decisions holding that a reviewing court must apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or contravene express legislative intent. *Bradley v. School Board of Richmond*, 416 U.S. 696, 711-21, 40 L. Ed. 2d 476, 94 S. Ct. 2006 (1974). Because neither limiting factor is present in this case, we have no choice but to respect the intervening change in the law effected by the President in his new Executive Order.

238 U.S. App. D.C. 165, 738 F.2d 1311, 1315 (1984).

The nature of the law at issue can affect whether it should be granted retroactive application, but courts have applied changes to civil rights laws retrospectively. *See Kopec v. City of Elmhurst*, 193 F.3d 894, 898 (7th Cir. 1999) (applying amendments to the Age Discrimination in Employment Act of 1967, as amended (the "ADEA"), 29 U.S.C. § 621, *et seq.,* to bar plaintiff's age discrimination claim, even though the ADEA exemption did not apply to plaintiff when he

was not hired); *King v. Shelby Medical Center*, 779 F. Supp. 157 (N.D. Ala. 1991); *Mojica v. Gannett Co.*, 779 F. Supp. 94 (N.D. Ill. 1991); *Sanders v. Culinary Workers Local #226*, No. CV-S-89-735, 1992 WL 25407 (D. Nev. Feb. 11, 1992).

Since the decision in *Sea-Land Serv,* the Supreme Court has recognized that a law may be applied retroactively within constitutional limits. In *Landgraf v. USI Film Products*, the Court noted that: "Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, correct mistakes, to prevent circumvention of new statutes in the interval of its passage, or simply to give comprehensive effect to a new law . . ." 511 U.S. 244, 267-68 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994).

Whether to apply the January 20, 2025, Executive Order retroactively begins with the analysis set forth in *Landgraf*:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id*. at 280.

Whether to apply the January 21, 2025, Executive Order retroactively begins with the three-factor analysis set forth in *Landgraf*: the Court must determine whether it would impair rights a party possessed when it acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. *Id.*

Here, the Executive Order does not expressly prescribe the statute's proper reach.[7] Thus, to determine whether it should be applied retroactively, one must review whether applying the Executive Order retroactively would impair rights a party possessed when they acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. The answer to those questions here dictates that retroactive application is appropriate.

Retroactive application of the Executive Order will not impair the rights a party possessed when they acted. At the time that the parties acted here, Plaintiff sought and was denied the right to use the girls' bathrooms. Concomitantly, the District took action to deny that request, asserting that Title IX does not require it to allow a male student to use female restrooms, even if they identify as a female. When the parties acted, Plaintiff had no right to use the female restrooms, and retroactive application of the Executive Order will not change that. Likewise, at the time the District acted, it was asserting that Plaintiff had no right to use the girls' bathroom. That too will not change with retroactive application of the Executive Order. This factor weighs in favor of retroactive application of the Executive Order.

Retroactive application of the Executive Order will also not increase either party's liability for past conduct. Plaintiff has no exposure to liability. Defendants, on the other hand, do, and their exposure to liability will not be increased by retroactive application of the Executive Order. In fact, retroactive application of the Executive Order will diminish Defendants' potential liability in this matter. This factor weighs in favor of retroactive application of the Executive Order.

---

[7] One can infer by its terms that the Executive Order was intended to apply retroactively. The Executive Order did not seek to create new law. Rather, it sought to clarify that Title IX was being misconstrued by those who concluded that "sex" encompasses more than male or female or that it encompasses gender identify. The Executive Order specifically directed that it was being issued to "correct the misapplication of the Supreme Court's decision in *Bostock v. Clayton County* (2020) to sex-based distinctions in agency activities." The misapplication has occurred in the past, and thus the Executive Order appears to seek to apply to those who have misinterpreted Title IX in the past as well as moving forward.

11

Retroactive application of the Executive Order will not impose new duties with respect to transactions already completed. Retroactive application of the Executive Order imposes no new duties on Plaintiff. Likewise, retroactive application of the Executive Order imposes no new duties on Defendants. What has been done in this case cannot be undone but no new duties will arise from retroactive application of the Executive Order. This factor also weighs in favor of retroactive application of the Executive Order.

The Executive Order should be applied retroactively. This application is further supported by the February 4, 2025, Dear Colleague Letter, which clarified that the Department of Education "will enforce Title IX under the provisions of the 2020 Title IX Rule, rather than the 2024 Title IX Rule" and that it will be enforcing Title IX consistent with the Executive Order, specifically "the reality that there are two sexes, male and female, and that these sexes are not changeable and are grounded in fundamental and incontrovertible reality." This directive indicates that if a complaint is filed tomorrow about a male student being previously denied access to the female bathrooms, the Department of Education intends to apply the law set forth in the January 20, 2025 Executive Order, not just that it will only apply the Executive Order moving forward.

This Court should apply the law in effect at the time of its decision: Title IX as clarified by the executive orders, not the Seventh Circuit's interpretation of Title IX from *Whitaker* and *Martinsville*. As the Executive Order makes clear, those decisions misconstrued Title IX. Prior to the Executive Order, there was no definitive authority supporting the Seventh Circuit's broad interpretation of Titel IX. The executive orders, however, clarify and confirm that the Seventh Circuit's interpretation of Title IX is no longer sustainable.

**B.** **The Executive Orders Foreclose Any Prospective Relief For Plaintiff As A Requirement That Only Females May Use Girls' Bathrooms And Locker Rooms Does Not Violate Title IX As A Matter Of Law.**

Part of the relief that Plaintiff seeks in this case is the continuation of the current preliminary injunction and a permanent injunction allowing Plaintiff to use the girls' bathrooms and locker rooms within the District. These requests, however, would effectively order the District to violate Title IX as it has been clarified by the executive orders and expose the District to enforcement actions by the federal government and the risk of losing its federal funding.

A district court does not have the authority to order a party to violate federal law. *See Ind. Prot. & Advoc. Serv. Comm'n v. Ind. Family & Soc. Serv. Admin.*, No. 1:24-cv-00833-TWP-TAB, 2024 U.S. Dist. LEXIS 161371, at *16 (S.D. Ind. Sep. 9, 2024) ("[T]the Court does not have the authority to order FSSA to violate federal law."); *c.f. Texas v. United States*, 740 F. Supp. 3d 537, 2024 U.S. Dist. LEXIS 121812, at *46-47 (N.D. Tex. 2024) (granting preliminary injunction to ensure that Texas may continue to enforce its laws and policies without risking the loss of Title IX funding). Thus, Plaintiff cannot obtain the requested injunctive and declaratory relief sought in this lawsuit.

Plaintiff provides no basis for the claim that the Court should not consider the Executive Order. President Trump is not enacting, amending, or repealing a statute. Rather, the Executive Order clarifies how the undefined terms used in Title IX should be used in light of no other instruction from Congress. The executive orders bar any equitable relief or damages sought in this case after January 20, 2025, and prevent the Court from issuing an order for the District to violate Title IX as currently enacted and enforced.

13

**III. TITLE IX DOES NOT ENCOMPASS GENDER IDENTITY AND DOES NOT DEMAND THAT PUBLIC SCHOOL DISTRICTS PERMIT TRANSGENDER STUDENTS TO USE THE BATHROOMS AND LOCKER ROOMS OF THEIR CHOICE.**

If the Court does not apply the Executive Order retroactively, that does not mean that Plaintiff is entitled to summary judgment. Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Again, Defendants recognize the holdings of *Martinsville* and *Witaker* but posit that those cases did not squarely address the Spending Clause and utilize reasoning that has been squarely rejected by the majority of the courts across the Country that have addressed this issue.

**A. The Spending Clause's Clear Statement Rule Undermines The Seventh Circuit's Interpretation of Title IX.**

When Congress acts pursuant to the Spending Clause, it creates legislation "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L.Ed.2d 694 (1981). Thus, in interpreting Spending Clause legislation, courts must insist "that Congress speak with a clear voice." *Id.* "There can, of course, be no knowing acceptance [of the terms of the contract] if a State is unaware of the conditions [of the legislation] or is unable to ascertain what is expected of it." *Id.* at 24-25. To find such a knowing acceptance, the Court must determine "whether Congress spoke so clearly that it can fairly say that the State could make an informed choice." *Id.* at 25. This is referred to as a Clear Statement Rule and the Clear Statement Rule applies with particular force when a federal-funding condition "encroache[s] upon a traditional state power," such as the regulation of education. *Kentucky v. Yellen*, 54 F.4th 325, 354

14

(6th Cir. 2022) (citing *SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173, 121 S. Ct. 675, 148 L.Ed.2d 576 (2001)).

Under the Spending Clause analysis, public school districts had no notice, and certainly not "clear notice" from Congress that maintaining separate bathrooms based on biological sex would threaten their federal funding. *See* [ECF 31, pp. 7-15]. With respect to this Court's determination that the Spending Clause argument was not persuasive, relying on two Court of Appeals decisions that are in contradiction of the plain language of Title IX would not have put the District on notice that it was subject to private damages for not allowing biological boys to use the women's bathroom or locker rooms in its schools.

Neither *Martinsville* nor *Whitaker* considered that a Title IX claim is unlike any case that arises under Title VII because Congress enacted Title IX, and not Title VII, pursuant to the Spending Clause. *Compare Davis, ex rel. Lashonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999) (recognizing that Title IX was passed pursuant to the Spending Clause) *to Fitzpatrick v. Bitzer*, 427 U.S. 445, 458, 96 S. Ct. 2666, 49 L.Ed.2d 614 (1976) (Brennan, J., concurring) (recognizing that Title VII was passed pursuant to the Commerce clause and § 5 of the Fourteenth Amendment).

Courts also cannot rely on *Bostock v. Clayton Cty.'s* holding that Title VII's protections against sex discrimination include one's transgender status, because but the Supreme Court specifically noted that it was not applying its holding to Title IX or other statutes. The Court noted:

> But none of these other laws [a reference that included title IX] are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind.

140 S. Ct. 1731, 1753, 207 L.Ed.2d 218, 248 (2020). One can conclude that the *Bostock* Court "specifically did not determine whether *Bostock* applied to other federal laws" and it did not have

before it the analysis of how the Spending Clause and its Clear Statement Rule affects Title IX and the Title IX implications for bathrooms and locker rooms. *Louisiana v. United States Dep't of Educ.*, 737 F. Supp. 3d 377, 397 (W.D. La. 2024).

Congress cannot use Spending Clause legislation to impose conditions on federal funds recipients through broad or vague terms interpreted on a case-by-case basis. "A clear statement is necessary not only for the statute to apply at all, but to also apply it in the way one is claiming." *Gregory v. Ashcroft*, 501 U.S. 452, 460-70, 111 S. Ct. 2395, 115 L.Ed.2d 410 (1991). There is simply no clear reading of Title IX, as written by Congress, that even remotely suggests that a federal funding recipient may be liable for sex discrimination by separating bathrooms and locker rooms on the basis of biological sex or that sex includes one's gender identity. *See Tennessee v. Cardona*, 737 F. Supp. 3d 510, 2024 U.S. Dist. LEXIS 106559, at *26-27 (E.D. Ky. 2024). Giving "discrimination" "on the basis of sex" its ordinary meaning, Title IX prohibits "treating an individual *worse* than others who are similarly situated" "'based on biological sex.'" Even if it could be said that the meaning of the term "sex" was ambiguous or that it was plausible that Congress contemplated a definition founded in one's gender identity when Title IX was enacted, imposing liability based on interpreting ambiguities and plausibilities is foreclosed by the Clear Statement Rule.

It was inappropriate for the Seventh Circuit to rely on the interpretation of Title VII[8] in analyzing whether Title IX prohibited schools from separating bathrooms by biological sex. While Title VII makes sex "not relevant to the selection, evaluation, or compensation of employees," *Bostock*, 140 S. Ct. at 1741, the Title IX framework expressly allows a funding recipient to maintain separate sports teams based on sex, 34 C.F.R. § 106.41(b), to provide for

---

[8] In fact, the *Bostock* court made it clear that Title VII does not drive the interpretation of Title IX, demonstrating that the Seventh Circuits reliance on title VII was misguided.

16

separate toilet, locker room, and shower facilities based on sex, 34 C.F.R. § 106.33, and to provide separate living facilities for the different sexes, 20 U.S.C. § 1686. In other words, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Adams*, 57 F.4th at 811.[9] In fact, the Title IX framework effectively <u>requires</u> a recipient to maintain separate sports teams, bathrooms, locker rooms, showers, and living facilities. *See Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 62-64 (2d Cir. 2023) (Park, J., concurring). In other words, Title IX "explicitly authorize institutions to treat males and females differently in certain situations. And the language Congress employed presumes that males and females will be separated based on biological sex." *Tennessee*, 737 F. Supp. 3d 510, 2024 U.S. Dist. LEXIS 106559, at *27.

Thus, while an employer risks Title VII liability when it makes employment distinctions among employees based on sex, a school district actually risks Title IX liability when it *fails* to distinguish between students based on sex. *See Soule*, 90 F.4th at 62-64. These carve outs that preserve separate sports teams, bathrooms, locker rooms, showers, and living facilities based upon sex would have no meaning if "sex" is a fluid concept.

The interpretation of the term "sex" as being a genetic component comports with the well-established tenants of statutory construction. *See Tennessee*, 737 F. Supp. 3d 510, 2024 U.S. Dist. LEXIS 106559, at *26-27; [ECF 31, pp. 12-14]. Nothing about the term "sex" is ambiguous and its plain and ordinary public meaning at the time of Title IX's enactment is obvious that it related to a genetic component, not a self-declared identity. *See Tennessee*, 737 F. Supp. 3d 510, 2024 U.S. Dist. LEXIS 106559, at *26-27. Dictionary definitions of the term "sex" at the time Congress

---

[9] It is notable that Judge Easterbrook opined in his concurrence in *Martinsville*, that "that *Adams* is closer to the mark in concluding that 'sex' in Title IX has a genetic sense, given that word's normal usage when the statute was enacted." 75 F.4th at 775 (Easterbrook, J., concurring).

enacted Title IX in 1972 squarely focused on the biological and physiological differences between men and women—not gender identity. *See id.* (collecting dictionary definitions and finding that at the time Title IX was passed the term "sex" ordinarily was understood to mean "the character of being either male or female"); [ECF 31, p. 13] (collecting dictionary definitions).

The term "sex" as built into Title IX and its implementing regulations means biological or genetic sex based on the plain meaning of that term when the statute was enacted, and it does not mean gender identity. That plain meaning must be consistently applied to that term whenever it is referenced. *See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512, 203 L.Ed.2d 791 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning.").

As explained by the Eleventh Circuit in *Adams*:

> Under the Spending Clause's required clear-statement rule, the School Board's interpretation that the bathroom carve-out pertains to biological sex would only violate Title IX if the meaning of 'sex' unambiguously meant something other than biological sex, thereby providing the notice to the School Board that its understanding of the word 'sex' was incorrect. As we have thoroughly discussed, it does not . . . Moreover, schools across the country separate bathrooms based on biological sex and colleges and universities across the country separate living facilities based on biological sex. The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable.

57 F.4th at 815-16.[10]

Under the circumstances presented here, it should be found that the Clear Statement Rule precludes a finding that "sex" under Title IX includes one's gender identity as it is "not

---

[10] Other federal courts across the country have recognized that the ordinary public meaning of "sex" at the time of Title IX's enactment referred to the biological distinction between male and female. *See Bridge v. Okla. State Dep't of Educ.*, No. CIV-22-00787-JD, 2024 U.S. Dist. LEXIS 6714, at *15 (W.D. Okla. Jan. 12, 2024); *Neese v. Becerra*, 640 F. Supp. 3d 668, 684 (N.D. Tex. 2022); *D.H. by A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 835-36 (M.D. Tenn. 2022); *cf. Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632-33 (4th Cir. 2020) (Niemeyer, J., dissenting).

immediately obvious what the grantee's obligations under the federal program were and it is surely not obvious that the grantee was aware that it was administering the program in violation of the statute or regulations." *Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 598, 103 S. Ct. 3221, 77 L.Ed.2d 866 (1983). Simply put, it is a fallacy to suggest that Congress intended to penalize school boards for interpreting "sex" under Title IX to refer to anything other than the physiological differences between men and women.

This Court is not prohibited by *Martinsville* and *Whitaker* from interpreting Title IX under the Clear Statement Rule and in light of the developing case law on this topic, it can find in this instance that Title IX does not equate sex with gender identity or provide transgender students unfettered access to the bathroom of their choice.

This Court acknowledged that it can disregard Seventh Circuit precedent if it is "powerfully convinced that the [Seventh Circuit] would overrule it at the first opportunity." [ECF 49, p. 32] (citing *Wilson v. Est. of Burge*, 667 F. Supp. 3d 785, 882 (N.D. Ill. 2023); *CorpenoArgueta v. United States*, 341 F. Supp. 3d 856, 863 (N.D. Ill. 2018)). While, "[p]recedents do not cease to be authoritative merely because counsel in a later case advance a new argument[,] . . . as a practical matter an opinion that contains no discussion of a powerful ground later advanced against it is more vulnerable to being overruled than an opinion which demonstrates that the court considered the ground now urged as a basis for overruling." *United States v. Hill*, 48 F.3d 228, 232 (7th Cir. 1995); *see also Webster* v. *Fall*, 266 U.S. 507, 511, 69 L. Ed. 411, 45 S. Ct. 148 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

When the prior presidential administration issued a new administrative rule that required schools to allow transgender students to use the bathroom or changing facilities that corresponds

to their gender identity, *see* 85 Fed. Reg. 30026 (2020), it was met with immediate legal challenges. *See, e.g., Kansas v. United States Dep't of Educ.*, 739 F. Supp. 3d 902 (D. Kan. 2024). The administrative rule mirrored the Seventh Circuit's interpretation of Title IX. Notably, every single court to address this issue has found that an interpretation of the meaning of "'on the basis of sex' to include 'gender identity' turns Title IX on its head." *Tennessee v. Cardona*, Civil Action No. 2: 24-072-DCR, 2025 U.S. Dist. LEXIS 6197, at *10-11 (E.D. Ky. Jan. 9, 2025); *see also Tennessee*, 737 F. Supp. 3d 510, 2024 U.S. Dist. LEXIS 106559, at *36 ("The Department's new definition of 'discrimination on the basis of sex' wreaks havoc on Title IX and produces results that Congress could not have intended."); *Alabama*, 2024 U.S. App. LEXIS 21358, at *11 ("[I]t is certainly highly likely that the Department's new regulation defining discrimination 'on the basis of sex' to include 'gender identity' is contrary to law and 'in excess of statutory . . . authority.'"); *State v. Cardona*, No. CIV-24-00461-JD, 2024 U.S. Dist. LEXIS 135314, at *14 (W.D. Okla. July 31, 2024) ("[T]he Department exceeded its statutory authority under Title IX by implementing a regulation that expands sex discrimination to include discrimination on the basis of gender identity."); *Arkansas v. United States Dep't of Educ.*, No. 4:24 CV 636 RWS, 2024 U.S. Dist. LEXIS 130849 (E.D. Mo. July 24, 2024); *Texas*, 740 F. Supp. 3d at 537; *Kansas*, 739 F. Supp. 3d at 902; *Louisiana*, 737 F. Supp. 3d at 377.

In summary, "when Title IX is viewed in its entirety, it is abundantly clear that discrimination on the basis of sex means discrimination on the basis of being a male or female." *Tennessee*, 2025 U.S. Dist. LEXIS 6197, at *10. The Clear Statement Rule precludes liability against the District for monetary damages under Title IX.

**B. A Diagnosis Is Required Before Title IX Protections For Transgender Students Apply.**

Title IX does not apply until after a school is formally put on notice that a student has Gender Dysphoria.[11]

The District did not have notice that Plaintiff was diagnosed with gender dysphoria until the filing and service of this lawsuit. *See* [ECF 1, ¶ 27]. While Plaintiff and Plaintiff's parents told the District that Plaintiff identified as a girl since 2022, *see* [ECF 58, p. 2], there was never a formal diagnosis. This fact is critical because no court has recognized that a unilateral declaration of being transgender, without a diagnosis of gender dysphoria, implicates Title IX. *See* [ECF 31, pp. 15-16]. While Defendants acknowledges that Plaintiff did not "merely announce" Plaintiff's gender identity, unilateral claims of gender identity without a medical diagnosis of gender dysphoria should still be required before allowing a biological male to share bathrooms and locker rooms with biological female students. *See id.* The cases within the Seventh Circuit in which transgender students have been able to invoke protection under Title IX have involved students who established that they were diagnosed with gender dysphoria at the time they requested to use a specified bathroom. *See, e.g., id.* (describing the medical diagnosis in Seventh Circuit bathroom access cases). None of these cases endorse a student's ability to claim transgender status without any medical documentation and a formal diagnosis.

Thus, when Plaintiff and Plaintiff's parents met with Mr. Ghilani in November 2022 to develop a gender support plan, *see* [ECF 58, pp. 7-8], the District was under no legal obligation to permit Plaintiff to use the girls' bathroom. *Whitaker* and other Seventh Circuit cases do not require school districts to accept unilateral declarations of gender. Even if Title IX requires unfettered

---

[11] Defendants recognize that the Court disagreed with this conclusion. It is asserted here to preserve the issue for appeal.

bathroom access, that right cannot be triggered until there is a formal diagnosis of Gender Dysphoria.

### C. Offering Gender Neutral Alternatives Cannot Violate Title IX.

Notwithstanding the language in *Whitaker* that providing gender-neutral alternatives is essentially irrelevant, *see* 858 F.3d at 1050, requiring a transgender student to use a gender-neutral bathroom does not in of itself violate Title IX. In the Seventh Circuit cases addressing the issue there were factual findings that the gender-neutral alternatives were not true alternatives due to the number of such bathrooms and their distance from the students' classrooms. *See, e.g.,* [ECF 31, p. 17].

Elkhorn Area Middle School is a two-story building. [ECF 58, p. 3]. There are four multi-occupancy girls' restrooms and four multi-occupancy boys' restrooms, with two of each on each floor. *Id.* There is also one girls' locker room and one boys' locker room on the first floor, each of which includes a restroom. *Id.* Prior to August 2023, there were four single-occupancy gender-neutral restrooms on the first floor of EAMS located within the main office and a classroom. *Id.* Beginning in the 2023-2024 school year, the District converted several single-occupancy men's and women's faculty restrooms on the second floor to gender-neutral restrooms available to all students and staff. *Id.* Students do not need special permission to use one of these gender-neutral restrooms. *Id.* Plaintiff cannot demonstrate that these gender-neutral alternatives are not true alternatives. The Court should rely on the conclusion in *Adams* that Title IX "neither requires nor prohibits" the provision of "single-stall, sex-neutral bathrooms" and that the provision of these alternatives as long as they are actual alternatives is material to the case. 57 F.4th at 817. Plaintiff has failed to show that using a gender-neutral bathroom is onerous, and thus the requirement does not violate Title IX.

IV.    **A POLICY REQUIRING STUDENTS TO USE THE BATHROOM THAT CORRESPONDS TO THEIR BIOLOGICAL SEX DOES NOT VIOLATE EQUAL PROTECTION.**

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2. This clause does not proscribe sex-based classifications; "[i]t simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 120 L.Ed.2d 1 (1992). Again, Plaintiff's argument is limited to citing *Martinsville* and *Whitaker* and concluding that Plaintiff is entitled to judgment as a matter of law.

A.    **The Executive Orders Make It Clear That Denying A Male Use Of Female Bathrooms and Locker Rooms Cannot Violate The Equal Protection Clause.**

"Not every classification . . . triggers Equal Protection analysis. The equal protection clause's proscription of differential treatment applies only where individuals are similarly situated." *Bradley v. Work*, 916 F. Supp. 1446, 1455 (S.D. Ind. 1996) (internal citations omitted). Failure to identify similarly situated individuals forecloses an equal protection claim. *See Wroblewski v. Washburn*, 965 F.2d 452, 459 (7th Cir. 1992) ("The equal protection clause's proscription of differential treatment applies only where individuals are similarly situated.").

Based on the Federal government's recent clarification that the United States only recognizes two sexes, male and female, a policy that requires biological men and biological women to use the bathroom that corresponds with their sex does not proscribe differential treatment amongst similarly situated individuals. *C.f. L.W. v. Skrmetti*, 83 F.4th 460, 479-80 (6th Cir. 2023) (concluding that the laws "treat similarly situated individuals evenhandedly" because the laws "regulate sex-transition treatments for all minors, regardless of sex" and such an "across-the-board" regulation lacks the hallmarks of sex discrimination because it does not prefer one sex over

23

the other); *Gore v. Lee*, 107 F.4th 548, 555-61 (6th Cir. 2024) (holding birth certificate amendment policy does not discriminate against transgender people based on sex for equal protection purposes).

In other words, Plaintiff as a male, even if a self-proclaimed transgender girl, cannot meet the requirement of showing differential treatment amongst similarly situated individuals. *See D.H. v. Williamson Cty. Bd. of Educ.*, No. 3:22-cv-00570, 2024 U.S. Dist. LEXIS 158653, at *14 (M.D. Tenn. Sep. 4, 2024) ("[A]lthough Plaintiff identifies as a girl, the Act prohibits her from using the facilities that correspond to her gender identity, while students who identify with their biological sex at birth are permitted to use such facilities. However, the Act and policy do not prefer one sex over the other."). The Federal government only recognizes two sexes, male and female. Plaintiff is a biological male. For Plaintiff to succeed on an Equal Protection claim, Plaintiff must show differential treatment from other biological males. But all Plaintiff claims is that Plaintiff is a biological male that is being treated differently from biological females. In light of the clarification of the term sex throughout Federal law, Plaintiff's equal protection claim fails and should be dismissed. *See* Fed. R. Civ. P. 56(f)(1).

### B. Even If Equal Protection Is Triggered, The District's Policy Does Not Violate Equal Protection.

The level of scrutiny to be applied to a court's review of governmental action under the Equal Protection Clause is critical because governmental action is presumed to be valid if it is evaluated under the rational-basis standard of review. *See Smith v. City of Chicago*, 457 F.3d 643, 650 (7th Cir. 2006). Only if the action is based upon suspect classifications does the level of scrutiny increase and become subject to a heightened standard, such as strict or intermediate scrutiny. *See id.*

1.      **Transgender Identity Is Not A Quasi-Suspect Class And Rational Basis
        Review Should Be Applied.**

The Supreme Court has admonished lower courts to not create new suspect classifications.
*See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441, 105 S. Ct. 3249, 3255, 87 L. Ed.
2d 313 (1985). Absent a suspect classification, rational basis review applies and under rational
basis review, a non-suspect classification is "accorded a strong presumption of validity" and
"cannot run afoul of the Equal Protection Clause if there is a rational relationship between the
disparity of treatment and some legitimate governmental purpose." *Richenberg v. Perry*, 909 F.
Supp. 1303, 1311 (D. Neb. 1995) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 319, 113 S. Ct. 2637,
2642, 125 L. Ed. 2d 257 (1993)). "The subject action, policy, or statute is presumed constitutional
and the government has no obligation to produce evidence to sustain the rationality of the
classification." *Heller*, 509 U.S. at 320.

The Supreme Court has never recognized transgender gender identity as a suspect class.
*See D.H. v. Williamson Cty. Bd. of Educ.*, 638 F. Supp. 3d 821, 832 (M.D. Tenn. 2022). And, the
Seventh Circuit has not explicitly ruled on this issue. *See* [ECF 31, p. 19]. The Supreme Court
has not recognized a new constitutionally protected class in over four decades and that "hesitancy
makes sense here [because] [g]ender identity and gender dysphoria pose vexing line-drawing
dilemmas for legislatures." *L.W. v. Skrmetti*, 73 F.4th 408, 419-20 (6th Cir. 2023).

This Court is not bound by the choices of the *Whitaker* and *Martinsville* panels to "assume"
that intermediate scrutiny applies to Plaintiff's equal protection challenge. Those panels were
heavily influenced by their analysis of Title IX through the analogy to Title VII and assumed that
"sex" encompasses transgender gender identity. This Court should follow the lead of other courts
that have declined to create a new suspect class without Supreme Court guidance. *See, e.g.,*
*Skrmetti*, 73 F.4th at 419-20; *Lee v. Poudre Sch. Dist. R-1*, Civil Action No. 23-cv-01117-NYW-

STV, 2023 U.S. Dist. LEXIS 226003, at *55-56 (D. Colo. Dec. 19, 2023); *Fowler v. Stitt*, 676 F. Supp. 3d 1094, 1124 (N.D. Okla. 2023) ("Finding that transgender people are a quasi-suspect class would . . . subject *all* future legislation concerning transgender people to heightened scrutiny.").

The Executive Order also provides a rational basis for the District's decision that biological males must use the boys' bathrooms. The Executive Order demonstrates that there is a legitimate public interest in ensuring that "intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity." Sec. 4(d).

Under rational basis review, the District's action is presumed to be constitutional and for the reasons discussed below, a policy of separating bathroom and locker rooms based on biological sex is rationally related to the legitimate governmental interest of protecting the privacy rights of students.

**2.    Separating Bathrooms And Locker Rooms Based On Biological Sex Is Substantially Related To Important Governmental Objectives.**

Under the Equal Protection Clause, a policy that classifies based on sex (assuming that gender identity is viewed under the rubric of sex) is constitutional if it survives intermediate scrutiny. *United States v. Virginia*, 518 U.S. 515, 533, 116 S. Ct. 2264, 135 L.Ed.2d 735 (1996). Intermediate scrutiny requires that the government demonstrate that the sex-based "classification serves important governmental objectives." *Id.* And, the government must show "the discriminatory means employed are substantially related to the achievement of those objectives." *Id.*

The District's policy of separating bathrooms and locker rooms by biological sex fulfills the first prong by serving important objectives of complying with the 2025 executive orders and protecting the privacy interests of students in using the restrooms and changing rooms separately from the opposite sex, which in turn justifies the provision of separate bathrooms and locker rooms

26

for female and male students. *See, e.g.*, *Adams*, 57 F.4th at 804 ("The protection of students' privacy interests in using the bathroom away from the opposite sex and in shielding their bodies from the opposite sex is obviously an important governmental objective."). While this Court along with the Seventh Circuit believed that the privacy rights of other students is not necessarily legitimate, the right to privacy has long been protected under the Constitution. *See Quilici v. Vill. Of Morton Grove*, 695 F.2d 261, 280 (7th Cir. 1982).

The executive orders and case law recognize that individuals have a legitimate and substantial interest in bodily privacy such that their nude body, genitalia, and other private parts are not exposed to persons of the opposite biological sex, and courts have consistently recognized that the need for such privacy inheres in human dignity. *See, e.g.,* [ECF 31, p. 20-21] (collecting cases). While privacy concerns in restrooms are somewhat mitigated by the use of individual stalls, "this argument discounts . . . changing facilities and overnight accommodations. While privacy *may* not be as much of a concern in restrooms where stalls are widely used, the same cannot be clearly said of shared changing facilities and overnight accommodations." *Roe v. Critchfield*, No. 1:23-cv-00315-DCN, 2023 U.S. Dist. LEXIS 184789, at *23 (D. Idaho Oct. 12, 2023).

Separating middle school and high school restrooms and locker rooms by sex is substantially related to the achievement of the District's objectives of ensuring and maintaining student privacy, as students use the bathrooms and locker rooms in a separate space from the opposite sex and are thereby protected against bodily exposure to the opposite sex. This practice has been well recognized as "the law tolerates same-sex restrooms . . . to accommodate privacy needs." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010); *see also Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996)

27

("[S]egregation of inmates by sex is unquestionably constitutional."); *Fortner v. Thomas*, 983 F.2d 1024 (11th Cir. 1993) (maintaining that there is a "constitutional right to bodily privacy because most people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating"). Given the long history of allowing separate bathroom facilities based on sex, the Court should not hold that it violates the principles of equal protection for the District to "impose a sex-based classification which requires individuals in public school buildings to use the restroom corresponding with their biological sex." *Williamson Cty. Bd. of Educ.*, 638 F. Supp. 3d at 834.

While the Seventh Circuit was not swayed by student privacy concerns in *Martinsville* and *Whitaker*, the factual record in those cases did not support the existence of privacy risks. The District's concern for the privacy of students is not exaggerated and this legitimate interest is much more than a single parent complaint. *See, e.g.,* [ECF 33; 33-1 – 33-7] (filings of the Empowered Community Coalition, UA). There are legitimate privacy interests that warrant prohibiting transgender students from utilizing the bathroom and locker room that does not correspond with their biological sex. The District's policy passes intermediate review. *See Adams*, 57 F.4th at 805 ("The School Board's bathroom policy is clearly related to—indeed, is almost a mirror of—its objective of protecting the privacy interests of students to use the bathroom away from the opposite sex and to shield their bodies from the opposite sex in the bathroom, which, like a locker room or shower facility, is one of the spaces in a school where such bodily exposure is most likely to occur.").

## V.     PLAINTIFF HAS NOT ESTABLISHED INDIVIDUAL LIABILITY AGAINST MR. TADLOCK.

A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation." *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014); *see also Minix v.*

*Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation."). A plaintiff must show "a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017). "Put another way, personal involvement in the equal protection context requires specific intent to discriminate by each sued official." *Washington v. Bd. of Educ.*, No. 21 C 396, 2021 U.S. Dist. LEXIS 237795, at *17 (N.D. Ill. Dec. 8, 2021). Assuming that Plaintiff can even bring an equal protection claim[12], there is no basis for individual liability.

Mr. Tadlock is the District's Superintendent. Under Wisconsin law, a school district may hire an administrator (also referred to as a superintendent) for a district. *See* Wis. Stat. § 118.24(1). A superintendent is tasked with the "general supervision and management of the professional work of the schools and the promotion of pupils" and with "mak[ing] written recommendations to the school board on teachers, courses of study, discipline and such other matters as [he] thinks advisable and [to] perform such other duties as the school board requires." Wis. Stat. § 118.24(2)(a), (c). A superintendent like Mr. Tadlock works under the direction of a school board. *Id.* Wisconsin state law "vests the governmental, or policymaking, function exclusively in the School Board." *Hortonville Joint Sch. Dist. v. Hortonville Educ. Asso.*, 426 U.S. 482, 495, 96 S. Ct. 2308, 2315, 49 L.Ed.2d 1, 11 (1976). If an administrator only makes recommendations to the school board and performs duties assigned by the board, one cannot say that the administrator is responsible for setting policy. That function remains solely for the board. *Id.* Simply put, a Wisconsin superintendent "answers to the school board." *Sch. Dist. of Wis. Dells v. Littlegeorge*, 184 F. Supp. 2d 860, 885 (W.D. Wis. 2001).

---

[12] As outlined *supra*, Plaintiff's equal protection claim fails as a matter of law. As such, Mr. Tadlock cannot have individual liability under § 1983.

Plaintiff has failed to produce evidence that Mr. Tadlock had personal involvement with the alleged equal protection violation or had the requisite intent to discriminate. While Mr. Tadlock was generally familiar with Title IX and aware of the Seventh Circuit's decision in *Whitaker*, he did not personally deny Plaintiff the ability to utilize the bathrooms that corresponded with Plaintiff's gender identity. Rather, it is undisputed that "the School Board directed Mr. Tadlock to deny any request from a transgender student to use sex-specific school facilities matching their gender identity." [ECF 58, p. 12]. When Plaintiff's parents requested that Plaintiff be able to use the girl's bathroom, Mr. Tadlock explained that he did not have the authority to grant that request and that only the Board did:

> At Mr. Doe's request, he and Mrs. Doe met with Mr. Tadlock and Mr. McBurney the next day, August 31, 2023. Mr. Tadlock informed the Does that Jane would not be permitted to use girls' restrooms. He told the Does that there was nothing more he could do without School Board intervention and that the family could request to meet with the School Board if they wished.

*Id.* at 13. Mr. Tadlock was only enforcing a policy or practice required by the School Board. *Id.* at 15.

Plaintiff's argument that Mr. Tadlock was personally involved in the alleged deprivation from "reaching a strong consensus with the Board after a closed session" is insufficient to establish personal liability under Section 1983, when he had no authority to deviate from the Board's ultimate control over the policymaking function of the District. Plaintiff has not carried the burden of establishing that Mr. Tadlock had sufficient personal involvement or that he had specific intent to discriminate. Plaintiff is not entitled to summary judgment as to the personal liability claim against Mr. Tadlock. The undisputed facts demonstrate that Mr. Tadlock is entitled to summary judgment as to the individual capacity claim against him. *See* Fed. R. Civ. P. 56(f)(1).

30

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's motion for partial summary judgment. And, for the reasons set forth above and pursuant to Fed. R. Civ. P. 56 (f), the Court should grant summary judgment to Defendants and dismiss all of Plaintiff's claims.

Dated this 20th Day of February, 2025.

STADLER SACKS LLC
Attorneys for Defendants

By:     /s/ *Ronald S. Stadler*
Ronald S. Stadler
State Bar No. 1017450
Jonathan E. Sacks
State Bar No. 1103204

303 B North Main Street
West Bend, WI 53095
telephone: 262-304-0610
e-mail: jes@stadlersacks.com
      rss@stadlersacks.com

31